**MEDICAL COMMITTEE FOR HUMAN RIGHTS, Petitioner,**

**v.**

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 23105.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 9, 1970.

Decided July 8, 1970.

Petition for Rehearing Denied Aug. 26, 1970.

---

Mr. Roberts B. Owen, Washington, D. C., with whom Messrs. Edwin M. Zimmerman, Richard B. Herzog and Paul S. Hoff, Washington, D. C., were on the brief, for petitioner.

Mr. Richard E. Nathan, Special Counsel, Securities and Exchange Commission, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Philip A. Loomis, Jr., General Counsel, and David Ferber, Solicitor, Securities and Exchange Commission, were on the brief, for respondent.

Before McGOWAN, TAMM, and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

The instant petition presents novel and significant questions concerning implementation of the concepts of corporate democracy embodied in section 14 of the Securities Exchange Act of 1934, and of the power of this court to review determinations of the Securities and Exchange Commission made pursuant to its proxy rules. For reasons to be stated more fully below, we hold that the Commission's action in the present case is reviewable, and that the cause must be remanded for further administrative proceedings.

## I. PROCEDURAL HISTORY OF THE CASE

On March 11, 1968, Dr. Quentin D. Young, National Chairman of the Medical Committee for Human Rights, wrote to the Secretary of the Dow Chemical Company, stating that the Medical Committee had obtained by gift several shares of Dow stock and expressing concern regarding the company's manufacture of the chemical substance napalm.[1] In part, Dr. Young's letter said:

> After consultation with the executive body of the Medical Committee, I have been instructed to request an amendment to the charter of our company, Dow Chemical. We have learned

---

1. Napalm is described as follows in 15 Encyclopaedia Britannica 1170 (1968):

 [T]he aluminum soap of naphthenic and palmitic acids which, when mixed with gasoline, forms a sticky sirup used in chemical warfare.

 In World War I both Germany and the Allies used raw gasoline in flame throwers * * * but it burned too quickly to be fully effective. What was needed was a thickener that would slow down the rate of burning and increase the range of the weapon. Napalm did this, and it also greatly raised the temperature at which the fuel burned. Harvard university scientists, in cooperation with the U. S. army chemical warfare service, developed the substance in 1942.

that we are technically late in asking for an amendment at this date, but we wish to observe that it is a matter of such great urgency that we think it is imperative not to delay until the shareholders' meeting next year.

\* \* \*

\* \* \* \* \* \*

We respectfully propose the following wording to be sent to the shareholders:

"RESOLVED, that the shareholders of the Dow Chemical Company request the Board of Directors, in accordance with the laws of the State of Delaware, and the Composite Certificate of Incorporation of the Dow Chemical Company, to adopt a resolution setting forth an amendment to the Composite Certificate of Incorporation of the Dow Chemical Company that napalm shall not be sold to any buyer unless that buyer gives reasonable assurance that the substance will not be used on or against human beings."

(App. 1a–2a.) The letter concluded with the following statement:

Finally, we wish to note that our objections to the sale of this product [are] primarily based on the concerns for human life inherent in our organization's credo. However, we are further informed by our investment advisers that this product is also bad for our company's business as it is being used in the Vietnamese War. It is now clear from company statements and press reports that it is increasingly hard to recruit the highly intelligent, well-motivated, young college men so important for company growth. There is, as well, an adverse impact on our global business, which our advisers indicate, suffers as a result of the public reaction to this product.

(App. 2a.) Copies of this letter were forwarded to the President and the General Counsel of Dow Chemical Company, and to the Securities and Exchange Commission. (App. 3a.)

By letter dated March 21, 1968, the General Counsel of Dow Chemical replied to the Medical Committee's letter, stating that the proposal had arrived too late for inclusion in the 1968 proxy statement, but promising that the company would "study the matter and \* \* \* communicate with you later this year" regarding inclusion of the resolution in proxy materials circulated by management in 1969. (App. 4a.) Copies of this letter, and of all subsequent correspondence, were duly filed with the Commission.

The next significant item of record is a letter dated January 6, 1969, noting that the Medical Committee was "distressed that 1968 has passed without our having received a single word from you on this important matter," and again requesting that the resolution be included in management's 1969 proxy materials. (App. 7a–8a.) The Secretary of Dow Chemical replied to this letter on January 17, informing the Medical Committee that Dow intended to omit the resolution from its proxy statement and enclosing an opinion memorandum from Dow's General Counsel, the contents of which will be discussed in detail in part III, *infra.* (App. 9a–12a.) On February 3 the Medical Committee responded to Dow's General Counsel, asserting that he had misconstrued the nature of their proposal in his opinion memorandum, and averring that the Medical Committee would not "presume to serve as draftsmen for an amendment to the corporate charter." (App. 15a.) The letter continued:

We are willing to bend \* \* \* to your belief that the management should be allowed to decide to whom and under what circumstances it will sell its products. Nevertheless, we are certain that you would agree that the company's owners have not only the legal power but also the historic and economic obligation to determine what products their company will manufacture. Therefore, [we submit] \* \* \* our revised proposal \* \* \* requesting the Directors to

consider the advisability of adopting an amendment to the corporate charter, forbidding the company to make napalm (any such amendment would, of course, be subject to the requirements of the "Defense Production Act of 1950," as are the corporate charters and management decisions of all United States Corporations), [and] we request that the following resolution be included in this year's proxy statement:

> "RESOLVED, that the shareholders of the Dow Chemical Company request that the Board of Directors, in accordance with the laws [*sic*] of the Dow Chemical Company, consider the advisability of adopting a resolution setting forth an amendment to the composite certificate of incorporation of the Dow Chemical Company that the company shall not make napalm."

(App. 16a.) On the same date, a letter was sent to the Securities and Exchange Commission, requesting a staff review of Dow's decision if it still intended to omit the proposal, and requesting oral argument before the Commission if the staff agreed with Dow. (App. 17a.)

On February 7, 1969, Dow transmitted to the Medical Committee and to the Commission a letter and memorandum opinion of counsel, which in essence reiterated the previous arguments against inclusion of the proposal and stated the company's intention to omit it from the proxy statement. (App. 18a–19a.) Shortly thereafter, on February 18, 1969, the Commission's Chief Counsel of the Division of Corporation Finance sent a letter to Dow, with copies to the Medical Committee, concluding that "[f]or reasons stated in your letter and the accompanying opinion of counsel, both dated January 17, 1969, this Division will not recommend any action * * * if this proposal is omitted from the management's proxy material. * * * *" (App. 20a.) In a letter dated February 28—which contains the first indications of record that petitioners had retained counsel—the Medical Committee again renewed its request for a Commission review of the Division's decision. (App. 24a.) On the same day, the Medical Committee filed with the Commission a memorandum of legal arguments in support of its resolution, urging numerous errors of law in the Division's decision. (App. 26a–32a.) Several other documents were filed by both the company and the Medical Committee; finally, on April 2, 1969, both parties were informed that "[t]he Commission has approved the recommendation of the Division of Corporation Finance that no objection be raised if the Company omits the proposals from its proxy statements for the forthcoming meeting of shareholders." (App. 44a–45a.) The petitioners thereupon instituted the present action, and on July 10, 1969, the Commission moved to dismiss the petition for lack of jurisdiction. On October 13 we denied the motion "without prejudice to renewal thereof in the briefs and at the argument on the merits."

In its briefs and oral argument, the Commission has consistently and vigorously urged, to the exclusion of all other contentions, that this court is without jurisdiction to review its action. We find this argument unpersuasive.

## II. JURISDICTION TO REVIEW

### A. *Timeliness*

The Commission's first argument on the jurisdictional point is that the instant petition was untimely filed, thereby depriving this court of power to adjudicate the controversy. This argument is based upon the provision of section 25(a) of the Securities Act, 15 U.S.C. § 78y(a) (1964), which requires that a petition for review must be filed "within sixty days after the entry" of a Commission order.

In the instant case the Commission's minutes reflect that the decision which was reached after reviewing the petitioner's proxy claim was made on March 24, 1969 (App. 46a), whereas the petition to review in this court was not filed un-

til May 29, 1969—some 66 days thereafter. It also appears uncontroverted that the Commission gave the Medical Committee some notification by telephone on March 24 that a decision had been reached, although the substance of this conversation is not reproduced in the briefs or record. (*Cf.* Supp. App. 3.) However, as we noted in the preceding section, petitioners did not receive any written information concerning the Commission's decision until a letter was mailed to them on April 2; in addition, the Medical Committee has asserted, without contradiction, that the Commission temporized for approximately four weeks after the petitioner requested a formal copy of the minutes of the decision, before making this important information available. (Reply Brief for Petitioner at 14 n. 2 and accompanying text.)

It must be noted that the Commission is itself rather untimely in making this assertion of untimeliness, for in its July 10 Motion to Dismiss it explicitly disclaimed any intention to press upon us an argument relating to the time of filing the instant petition.[2] This resolve apparently fell by the wayside, however, and the timeliness argument appeared in full dress in the Commission's responsive brief on the merits, thereby helping to trigger further rounds of briefing by both sides. We need not elevate the Commission's vacillation to the status of a waiver, however, because we have con-

cluded that its timeliness argument must fail on the merits.

The Commission relies primarily upon section 22(k) of its Rules of Practice, 17 C.F.R. § 201.22(k) (1970), which provides:

In computing any period of time involving the date of the entry of an order by the Commission, the date of entry shall be (1) the date of the adoption of the order by the Commission * * * or (2) in the case of orders reflecting action taken pursuant to delegated authority, the date when such action is taken. * * * *The order shall be available for inspection by the public from and after the date of entry, unless it is a non-public order. A non-public order shall be available for inspection from and after the date of entry by any person entitled to inspect it.* [Emphasis added.]

In essence, the Commission has taken the position that the date of decision, March 24, must be deemed the date of "entry" within the meaning of Rule 22(k), notwithstanding the language of the rule italicized above, and notwithstanding the fact that no written information regarding the basis of the decision was available until a substantial time after March 24.

None of the cases cited by the parties offers much guidance in resolving the particular timeliness question now before us;[3] however, we think it

---

2. Memorandum in Support of Respondent's Motion to Dismiss Petition for Review at 5 n. 2:

This court may, alternatively, be without jurisdiction based upon the Medical Committee's failure to file its May 29 petition to review "within sixty days after the entry of" the alleged order. * * * *We do not urge the point, however, since the Commission's staff did not advise the Medical Committee of the Commission's March 24 decision * * * until April 2.* * * * [Emphasis added.]

3. Lile v. SEC, 324 F.2d 772 (9th Cir. 1963), which seems most directly apposite to the facts of the instant case, was decided prior to the adoption of the

present version of Rule 22(k). *See* 29 Fed.Reg. 3424 (1964). Moreover, the discussion of the timeliness problem in *Lile* appears to be dictum, since the case was decided on the ground of exhaustion of administrative remedies. However, to the extent that the discussion in *Lile* is useful to elucidate the present inquiry, it militates against the Commission's argument: the text of that opinion clearly reflects the court's concern that orders which assertedly had the effect of starting the running of the 60-day review period were not readily available for public inspection. *See* 324 F.2d at 773.

M. G. Davis & Co. v. Cohen, 256 F. Supp. 128 (S.D.N.Y.), aff'd, 369 F.2d 360 (2d Cir. 1966), which the Commis-

clear that Rule 22(k), together with the 60-day statutory period for filing petitions for review, evidences an attempt by Congress and the Commission to strike a balance between the need to have Commission orders operate with finality, and the aggrieved party's need to have both adequate notice of the substance of the decision, and sufficient time to prepare his petition.[4] To hold that the running of the 60-day period can be initiated by a mere telephone call, as the Commission urges, would create risk of inequity and hardship to aggrieved parties and defeat the goal of orderly and open administrative procedures embodied in the italicized portions of Rule 22(k) quoted above. Therefore, we conclude that the instant petition for review is not barred for reasons of untimeliness.

### B. *The Existence of a Reviewable Order*

The most difficult problems presented by this case arise from a congeries of

related arguments supporting the general assertion that the Commission's decision regarding the Medical Committee's proxy proposal is not a reviewable order within the relevant jurisdictional statute. That statute is section 25(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a) (1964), which in pertinent part states:

> Any person aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person is a party may obtain a review of such order * * * in the United States Court of Appeals for the District of Columbia [Circuit], by filing in such court, within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or set aside in whole or in part.

Neither precedent[5] nor the legislative history of the Securities Act[6] offers an

sion relies upon, is distinguishable in that it involved a different provision of the Rules of Practice which governed the issuance of orders initiating administrative proceedings and which did not include language comparable to that contained in Rule 22(k) relating to the parties' immediate right to inspect orders affecting them.

4. For a discussion of an analogous problem of computation arising under the Federal Rules of Civil Procedure, *see* 4 C. Wright & A. Miller, Federal Practice and Procedure 632–42 (1969).

5. Dicta in a few cases and remarks by some scholarly commentators tend to indicate that it has generally been assumed that proxy decisions like the present one are not reviewable by the courts. *See, e. g.*, Klastorin v. Roth, 353 F.2d 182, 183 n.2 (2d Cir. 1965); Clusserath, The Amended Stockholder Proposal Rule: A Decade Later, 40 N.D. Lawyer 13, 17 (1964). However, we have found no holding that proxy decisions like the present one are unreviewable, and no adequate analysis of the myriad arguments bearing on the jurisdictional question.

6. The absence of any indication in the legislative history that Congress intended to preclude review serves to distinguish

the instant controversy from Schilling v. Rogers, 363 U.S. 666, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960), which the Commission heavily relies upon. *See, e. g.*, 363 U.S. at 671, 80 S.Ct. at 1292:

> The only express provision in the Trading with the Enemy Act for recourse to the courts by those claiming the return of property vested during World War II is that contained in § 9 (a). That section, however, is applicable only to persons not enemies or allies of enemies as defined in the relevant statutes, and hence is not available to this petitioner, an enemy national. * * *
>
> The question then is whether a right to such relief can fairly be implied, * * * The terms of § 32 and its legislative history speak strongly against any such implication.

*Cf.* Heikkila v. Barber, 345 U.S. 229, 233, 73 S.Ct. 603, 605, 97 L.Ed. 972 (1953): "Each statute in question must be examined individually; its purpose and history as well as its text are to be considered in deciding whether the courts were intended to provide relief for those aggrieved by administrative action. Mere failure to provide for judicial intervention is not conclusive; neither is the presence of language which appears to bar it."

unambiguous answer to the question of whether decisions of the kind presently before us should be categorized as reviewable orders under this provision; thus, we must resort to general principles and analogies in determining whether we have jurisdiction to adjudicate this controversy.

 Bypassing for the moment the question of whether deference to administrative discretion should compel us to foreclose review of this petition,[7] we begin by restating the well-established principle that there is a strong presumption in favor of the courts' power to review administrative action. As the Supreme Court concluded in Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), "[A] survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." This theme has been developed at greater length by Professor Jaffe in his study of the law of reviewability:

> Congress, barring constitutional impediments, may indeed exclude judicial review. But judicial review is the rule. * * * It is a basic right; it is a traditional power and the intention to exclude it must be made specifically manifest. * * *

The *Schilling* case is further distinguishable because the administrative action there in issue was found to be wholly within the province of administrative discretion; *see* 363 U.S. at 674, 80 S.Ct. 1288. As will be developed more fully below, we do not find the discretionary aspects of the Commission's action preclusive of review in the present controversy. Finally, it must be noted that the subject matter of the regulatory scheme in *Schilling* was permeated with overtones of foreign affairs and national defense policy—considerations which have always made the courts reluctant to review administrative action, and which obviously are totally lacking here. *See, e. g.,* Curran v. Laird, 136 U.S.App.D.C. 280, 420 F.2d 122 (1969) (*en banc*).

\* \* \* \* \* \*

\* \* \* The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent.

"L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 346, 357 (1965) [hereinafter "L. JAFFE"]. *See also* Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F. 2d 1093, 1097, 1098 (1970); Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859 (1970); 4 K. Davis, Administrative Law Treatise 1–32 (1958).

 Several other general observations which we have gleaned from our perusal of numerous cases and commentaries on reviewability must serve as prolegomena to our discussion of that issue in the present case. It appears that the factors most often relied upon in determining whether a particular administrative action is a reviewable order can be subdivided into two general categories. The first of these basic areas of concern involves consideration of whether the administrative action operates with final effect upon a particular individual, entity, or group.[8] *See, e. g.,* Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507 (1967); Is-

---

7. *See* part II C, *infra.* Schilling v. Rogers, 363 U.S. 666, 80 S.Ct. 1288 (1960), which is discussed in the preceding footnote, clearly indicates that the issue of whether particular administrative action is rendered unreviewable by implication of a statute or by pragmatic concerns should be considered a different inquiry from the question of whether agency discretion precludes review.

8. Frequently these considerations are analyzed under one or more of the related doctrines of ripeness, finality, and exhaustion of administrative remedies; however, it is not uncommon to find these factors treated under the more general rubric of reviewability.

brandtsen Co. v. United States, 93 U.S. App.D.C. 293, 298, 211 F.2d 51, 55, cert. denied, Japan Atlantic & Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954); L. Jaffe, 358, 403–404. The second line of analysis looks to the formalities preceding and attending the administrative action, for, as one commentator has stated, "the notion of an 'order' implies some formal characteristics." L. Jaffe 419; cf. Helco Products Co. v. McNutt, 78 U. S.App.D.C. 71, 137 F.2d 681 (1943); American Sumatra Tobacco Corp. v. SEC, 68 App.D.C. 77, 93 F.2d 236 (1937). Finally, the cases in the area seem virtually unanimous in proclaiming that pragmatic considerations, particularly those relating to the institutional relationships between the courts and the administrative agencies, must prevail over purely doctrinal arguments for or against reviewability. See, e. g., Abbott Laboratories, supra, 387 U.S. at 149, 87 S.Ct. 1507; American Federation of Labor v. NLRB, 308 U.S. 401, 408, 60 S.Ct. 300, 84 L.Ed. 347 (1940); Cities Service Gas Co. v. FPC, 255 F.2d 860, 862 (10th Cir.), cert. denied, Magnolia Petroleum Co. v. Cities Service Gas Co., 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958); Isbrandtsen Co., supra, 93 U.S.App.D.C. at 297, 211 F.2d at 55.

■ While the problem of whether there is sufficient formality is admittedly difficult in the present case, we need not pause long over the question of the decision's final effect upon petitioner. Here the administrative process had run its course with respect to petitioner's proxy proposal, and there can be no basis for any fear that review of the decision would cause the courts "to interfere in matters yet within the consideration of the Commission." Cities Service Gas Co., supra, 255 F.2d at 862. Here, also, we are dealing with a limited and easily identifiable class of individuals—shareholders of a regulated corporation—whom Congress sought to protect in section 14 of the Act, and who claim that they are wrongfully being denied fair corporate suffrage by the Commission's approval of Dow's decision to omit their proposal. Cf. Jaffe, The Individual Right to Initiate Administrative Process, 25 Iowa L.Rev. 485, 528 (1940). In this regard, we cannot see any merit in the Commission's contention that the petitioner has not suffered any "aggrievement" under the jurisdictional statute because it may still have relief through a private action against the company in a district court. The relevance of a possible private action will be examined more fully later in this portion of our opinion. For present purposes, it is sufficient to note that the Medical Committee has been forced to undergo a two-stage administrative proceeding, compelled by the risk that failure to do so would preclude any judicial relief by virtue of the exhaustion doctrine;[9] its recourse to an authoritative judicial determination of the merits of its proxy proposal has been substantially delayed because of the administrative proceeding, whereas time is clearly of the essence in proxy contests; and not only has the Medical Committee lost the potential benefit of the Commission's resources and expertise as an ally in compliance litigation against the company, it has also had imposed upon it the added burden in a private action of overcoming an adverse Commission determination in face of the principle that the agency is entitled to judicial deference in the construction of its proxy rules. See, e. g., Union Pacific R. Co. v. Chicago & N. W. Ry. Co., 226 F.Supp. 400, 408 (N.D.Ill. 1964). Moreover, we believe that there is a substantial public interest in having important questions of corporate democracy raised before the Commission and the courts by interested, responsible private parties. Cf. Scanwell Laboratories, Inc. v. Shaffer, supra, 137 U.S.App.D.C. at 375 – 376, 424 F.2d at 863–864 (1970); Environmental Defense Fund, Inc. v. Hardin, supra, 138 U.S.App.D.C. at 394–395, 428 F.2d at 1096–1097 (1970).

9. See Peck v. Greyhound Corp., 97 F.Supp. 679 (S.D.N.Y.1951).

Thus, we conclude that the Medical Committee is "aggrieved" for purposes of section 25(a) of the Act.

■ Finally, in the context of assessing the reviewability of the Commission's decision—as distinguished from our later inquiry into the scope of administrative discretion—it is clear that no significance whatsoever inheres in the fact that the administrative determination is couched in terms of a "no action" decision rather than in the form of a decree binding a party to perform or refrain from some particular act. This much has been clear ever since the Supreme Court interred the discredited "negative order doctrine" in Rochester Telephone Corp. v. United States.[10] That case, like the present controversy, involved a petitioner's attempt to obtain judicial review of "action by the Commission which affects the complainant because it does not forbid or compel conduct with reference to him by a third person." (307 U.S. at 135, 59 S.Ct. at 759.) The Court pointed out that "[n]egative has really been an obfuscating adjective" because it failed to illuminate "the real considerations on which rest * * * the reviewability of Commission orders within the framework of its discretionary authority and within the general criteria of justiciability." (307 U.S. at 141, 59 S.Ct. at 762.) The Court then concluded:

> An order of the Commission dismissing a complaint on the merits and maintaining the *status quo* is an exercise of administrative function, no more and no less, than an order directing some change in status. * * * Refusal to change an existing situation may, of course, itself be a factor in the Commission's allowable exercise of discretion. * * * But this bears on the disposition of a case and should not control jurisdiction.

(307 U.S. at 142, 59 S.Ct. at 763.) Similarly, section 10(e) of the Administrative Procedure Act provides judicial relief for "agency action unlawfully withheld or unreasonably delayed" (5 U.S.C. § 706(1) (Supp. V 1965–69)), and the courts have had little difficulty in determining when an administrative failure to act presents an appropriate occasion for judicial scrutiny. *Compare* Environmental Defense Fund v. Hardin, *supra*, with International Ass'n of Machinists & Aerospace Workers v. NMB, 138 U.S.App.D.C. 96, 425 F.2d 527 (1970); *see generally* Goldman, Administrative Delay and Judicial Relief, 66 Mich.L.Rev. 1423 (1968). Thus, there can be little doubt that the Commission's decision operates with sufficient particularity and finality to warrant judicial review.

■ The question of whether the procedures attending the Commission's decision in this case are sufficiently formal to make the determination a reviewable order under section 25(a) is admittedly a close one, but we believe that the considerations militating in favor of reviewability must prevail. At the outset, we note that the decided cases make it clear beyond doubt that the absence of a formal evidentiary hearing does not compel the conclusion that an administrative decision is unreviewable. *See, e. g.*, Cities Service Gas Co. v. FPC, 255 F.2d 860, 862–863 (10th Cir.), cert. denied, 358 U.S. 837, 79 S.Ct. 61 (1958); Phillips Petroleum Co. v. FPC, 227 F.2d 470, 475 (10th Cir. 1955), cert. denied, Michigan Wis. Pipe Line Co. v. Phillips Petroleum Co., 350 U.S. 1005, 76 S. Ct. 649, 100 L.Ed. 868 (1956); Isbrandtsen Co. v. United States, 93 U.S. App.D.C. 293, 297, 211 F.2d 51, 55, cert. denied, 347 U.S. 990, 74 S.Ct. 852 (1954). This is a sound and necessary doctrine because agencies frequently are confronted with situations in which substantial questions of fact, law, or policy may be properly resolved through information-gathering mechanisms less cumbersome than a trial-type hearing. This court has consistently recognized

---

10. 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). *See generally* 4 K. Davis, Administrative Law Treatise 87–93 (1958).

that this kind of flexibility in procedures is a desirable attribute of the administrative process, regardless of whether the power was explicitly provided by statute or rule, or was evolved on an ad hoc basis by implication from a broad statutory grant. However, our deference to the efficient deployment of administrative resources has not been—and logically could not be—considered a matter which touches upon the courts' jurisdiction to review the action in question, in the absence of a clear indication that Congress intended such a result. *See generally* National Air Carrier Ass'n v. CAB, No. 23,012 (D.C.Cir. May 28, 1970); H & B Communications Corp. v. FCC, 137 U.S.App.D.C. 70, 420 F.2d 638 (1969); Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F. 2d 577 (1969). Thus, we must look to the Commission's rules and to the attributes of the proceeding here in issue in order to determine whether this is an appropriate occasion for review.

Although the line is not drawn with complete clarity, the Commission's Rules of Practice distinguish between "formal" and "informal" proceedings. Procedures denominated "informal" by the Commission generally involve negotiation between the Commission and one private party, and normally culminate in a letter of advice to the party from a Commission staff member.[11] Here, however, there is an important difference which the Commission readily concedes:

> The difference is that in the normal no-action situation, there is only one interested private party and accordingly the Commission has not found it necessary to prescribe any rules dealing with the situation. The private party simply writes a letter which is answered.

> In the case of stockholder proposals, there are two interested private parties: the management and the shareholder. Consequently, Rule 14a–8(d) provides a procedure by which the position of both may be brought to the Commission's attention.

(Supplementary Memorandum of Respondent at 10.) Thus, the Commission's procedural regulations governing

---

11. 17 C.F.R. § 202.1 (1970) provides:

The statutes administered by the Commission provide generally (1) for the filing with it of certain statements, such as * * * proxy solicitation material * * * ; (2) for Commission determination through formal procedures of matters initiated by private parties or by the Commission; (3) for the investigation and examination of persons and records where necessary to carry out the purposes of the statutes. * * *

* * * * *

(c) *The statutes and the published rules, regulations and forms thereunder prescribe the course and method of formal procedures to be followed in Commission proceedings.* These are supplemented where feasible by certain informal procedures designed to aid the public and facilitate the execution of the Commission's functions. * * *

(d) The informal procedures of the Commission are largely concerned with the rendering of advice and assistance by the Commission's staff to members of the public dealing with the Commission. [Emphasis added.]

Informal negotiation also plays a large role in Commission hearings which are indubitably formal in nature; see, e. g., 17 C.F.R. § 202.4 (1970):

(a) Applications, declarations, and other requests involving formal Commission action after opportunity for hearing are scrutinized by the appropriate division for conformance with applicable statutory standards and Commission rules and generally the filing party is advised of deficiencies. * * *

(b) After the staff has had an opportunity to study an application or declaration, interested persons may informally discuss the problems therein raised to the extent that time and the nature of the case permit. * * *

(c) During the course of the hearings, the staff is generally available for informal discussions to reconcile bona fide divergent views not only between itself and other persons interested in the proceedings, but [also] among all interested persons; and, when circumstances permit, an attempt is made to narrow, if possible, the issues to be considered at the formal hearing.

proxy proposals incorporate the basic theory of an adversary encounter, and a detailed perusal of Rule 14a–8 and its history reinforces this impression.

For the shareholder who wishes to have his proposal included in management's proxy statement, Rule 14a–8, 17 C.F.R. § 240.14a–8 (1970), is the touchstone of procedural and substantive rights. Rule 14a–8(a) describes the initiation of this process by providing that the security holder "shall submit to the management of the issuer, within the time hereinafter specified, a proposal which is accompanied by notice of his intention to present the proposal for action at the meeting." The basic time period established in this section is 60 days, subject to certain qualifications. Subsection (b) then provides that if management opposes the shareholder's proposal, it must include in its proxy materials a 100-word statement by the proponent of the proposal. The substantive exceptions to the general rule of inclusion are then set forth in subsection (c), and several of these grounds for omitting a shareholder proposal will be discussed at length in part III, *infra*. The following provision, subsection (d), contains the procedural steps which are immediately relevant; it describes the course of proceedings which comes into play whenever management believes that it is entitled under the substantive criteria of the preceding section to omit a shareholder proposal.

Subsection (d) is phrased wholly in mandatory rather than permissive language. It requires management to "file with the Commission * * * a copy of the proposal and any statement in support thereof as received from the security holder, together with a statement of the reasons why the management deems such omission to be proper in the particular case, and, where such reasons are based on matters of law, a supporting opinion of counsel." At the same time, management must "notify the security holder submitting the proposal of its intention to omit the proposal" and "forward to him a copy of the statement

of the reasons why the management deems the omission of the proposal to be proper and a copy of such supporting opinion of counsel." This filing and forwarding must be completed "not later than 20 days prior to the date the preliminary copies of the proxy statement are filed pursuant to § 240.14a–6(a)"; this requirement was promulgated "[s]o that the Commission will have more time to consider the problems involved in such cases and the security holder will have an opportunity to consider the management's position and take such action as may be appropriate." 19 Fed. Reg. 246 (1954). Presumably this "other appropriate action" by the shareholder encompasses the possibility of filing with the Commission detailed legal arguments in favor of requiring the company to include the proposal, similar to the one which the Medical Committee filed with the Commission in the present case after the Division of Corporation Finance had made its recommendation, and which the Commission accepted without comment or objection. (App. 26a–32a; *see also id.* at 38a–39a.) Finally, the history of the rule explicitly states that it "places the burden of proof upon the management to show that a particular security holder's proposal is not a proper one for inclusion in management's proxy material." (19 Fed.Reg. 246 (1954).)

██ We think that these provisions contain persuasive indicia that the Commission's proxy procedures are possessed of sufficient "adversariness" and "formality" to render its final proxy determinations amenable to judicial review, although the scope and content of that review must yet be investigated. This conclusion is inferentially supported by cases dealing with private actions to enforce the proxy rules, in which shareholders have been required to exhaust the administrative remedies provided by the foregoing sections. Peck v. Greyhound Corp., 97 F.Supp. 679 (S.D.N.Y. 1951); *cf.* Dyer v. SEC, 291 F.2d 774, 778 (8th Cir. 1961). However, the Commission urges that the structure of section 14 of the Act gives rise to a doc-

trinal anomaly if administrative decisions like the present one are held reviewable. This difficulty arises from the fact that even when the Commission moves against recalcitrant management under section 14 of the Act to terminate or prevent violations of the proxy rules, there is never a traditional trial-type hearing followed by a conventional mandatory order. Professor Loss has catalogued the Commission's enforcement alternatives under section 14 as follows:

> [W]hen management or a security holder is adamant in refusing to comply with the rules as the Commission construes them, there is no administrative procedure comparable to the stop-order proceeding under the 1933 act. The Commission may investigate. It may use its statutory power to "publish information concerning * * * violations," as it did in two early instances. It may institute appropriate administrative proceedings of a disciplinary nature under the 1934 act when the offender happens to be a registered broker-dealer or an exchange member, as it may when some other statutory provision or Commission rule has been violated. It may even use a violation of section 14(a) as a basis for delisting the security. And it may ask the Attorney General to prosecute willful violations. But the principal sanction—and the only practicable way of forcing compliance—is the statutory action for injunction.

Loss, The SEC Proxy Rules in the Courts, 73 Harv.L.Rev. 1041, 1043–1044 (1960); see also Aranow & Einhorn, Corporate Proxy Contests: Enforcement of SEC Proxy Rules by the Commission and Private Parties, 31 N.Y.U.L.Rev. 875, 886, 886–887 n.50 (1956).

We see little force in this anomaly—if, indeed, it is in fact an anomaly. Through section 14 of the Act Congress has invested the Securities and Exchange Commission with sweeping authority to regulate the solicitation of corporate proxies; the few words employed by Congress in subsection (a) of this provision confer upon the Commission much power, but little guidance or limitation:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce * * * or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy * * * in respect of any security (other than an exempted security) registered pursuant to * * * this title.

(15 U.S.C. § 78n(a) (1964).) Pursuant to this broad mandate, the Commission has established elaborate procedures which are of unquestioned validity for present purposes and which, as we have indicated above, otherwise possess sufficient attributes of finality and formality to warrant judicial review. Viewing the proxy rules in this light, we see no substantial reason why the absence of formal adjudicatory hearings in the regulatory scheme should render Commission decisions, however capricious or erroneous, utterly immune to direct judicial review or redress. Indeed, it seems doubtful that there is any meaningful distinction between review in this situation and review in the commonly accepted context of judicial assessment of final agency determinations made well in advance of, or in collateral proceedings relating to, a statutorily prescribed trial-type hearing. See, e. g., Phillips Petroleum Co. v. FPC, supra, 227 F.2d at 475; Isbrandtsen Co. v. United States, supra, 93 U.S.App.D.C. at 297, 211 F.2d at 55.

On the other hand, we do see significant problems and anomalies which would result from accepting the Commission's restrictive interpretation of the jurisdictional statute. There is no doubt that the Medical Committee could obtain a judicial determination of the legitimacy of its claim through a private action against Dow Chemical in the dis-

trict court; the Supreme Court held that such a remedy is implicit in section 14(a) in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The essential question, then, is whether the district court is a more appropriate forum for adjudication of petitioner's claim than this court. We believe that every substantial consideration in this case leads to precisely the opposite conclusion.

Here the Medical Committee does not seek to contest any matters of fact which would require a trial de novo; rather, petitioner seeks only to have its proposal assessed by the Commission under a proper interpretation of the governing statutes and rules. The petitioner does not seek any relief which is peculiarly within the competence of the district court; instead, it seeks merely to have the cause remanded so that the Commission, in accord with proper standards, can make an enlightened determination of whether enforcement action would be appropriate. Thus we see no practical or theoretical virtues in commanding a course of action which "would result in equal inconvenience" to the petitioner, the Commission, and the overcrowded courts, and "would constitute circuitous routes for the determination of issues easily and directly determinable by review in this court." American Sumatra Tobacco Corp. v. SEC, 68 App.D.C. 77, 82, 93 F.2d 236, 241 (1937). *See also* Gardner v. Toilet Goods Ass'n, Inc., 387 U.S. 167, 191–193, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967) (Justice Fortas concurring and dissent-

ing); Environmental Defense Fund, Inc. v. Hardin, *supra*, 137 U.S.App.D.C. at 163–164, 428 F.2d at 1098–1099; L. Jaffe 358.

There is also, it seems to us, an independent public interest in having the controversy decided in its present posture rather than in the context of a private action against the company. The primary and explicit purpose of section 14(a) is "the protection of investors," and the primary method of implementing this goal is through Commission regulation of proxy statements, not through private actions by individual security holders. For the small investor, personal recourse to the Commission's proxy procedures without benefit of counsel may well be the only practicable method of contesting a management decision to exclude his proxy proposal.[12] In this situation, as our recent decisions make clear, it is particularly important that the Commission look carefully at the merits of the shareholder's proposal, and that it do so pursuant to an accurate perception of the Congressional intent underlying the proxy statute. *See generally* Hale v. FCC, 138 U.S.App.D.C. 125 at 134–135, 425 F.2d 556 at 565–566 (1970) (concurring opinion); Office of Communication of United Church of Christ v. FCC, 138 U.S.App.D.C. 112, 425 F.2d 543 (1969). Direct judicial review of Commission proxy decisions is unquestionably the most logical and efficient means of achieving this objective.

Thus, we hold that the Commission's decision in this case is presently reviewable, and turn our attention to an inves-

12. This contention was recently presented to the Commission in a proxy contest involving the General Motors Corporation. *See* Cong.Rec. E-2147 (daily ed., March 17, 1970):

It must be recognized that Management's proxy statement is the only effective vehicle through which all of the shareholders can have an opportunity to express themselves, and even to hear any arguments on the questions involved. * * * [T]he cost [of conducting a competing solicitation] is virtually prohibitive except to extremely well heeled shareholders. * * *

This is no ordinary dispute with Management; it is not an effort by insurgent shareholders to seize control of the corporation. If it were so, one could justify large expenditures because the individual rewards are great and because, if successful, the insurgents could obtain reimbursement of their expenses from the company. The issues here lack that personal pecuniary bias. Denial of access to the shareholders through management's proxy solicitation, practically speaking, is total denial.

tigation of the proper scope of this review.

### C. *Scope of Review and Administrative Discretion*

 Many of the Commission's most forceful arguments are addressed to the proposition that the action which the Medical Committee now asks us to review falls within the purview of administrative discretion and therefore is protected from judicial inquiry or interference by section 10 of the Administrative Procedure Act, 5 U.S.C. § 701(a) (2) (Supp. V, 1965-69). In large measure, this line of defense reflects the misconstruction of section 10 that Professor Davis has called an "all or none fallacy' which ignores the language and intent of this provision.[13] The more accurate interpretation of the statute holds that assertions of discretion inevitably raise questions of degree which must be appraised in the context of the relevant provisions of law and the nature of the particular action sought to be reviewed: "[T]he question is not *whether* agency action is by law committed to agency discretion but *to what extent* agency action is so committed." 4 K. Davis, Administrative Law Treatise 33 (1958) (emphasis added); *see also* Scanwell Laboratories, Inc. v. Shaffer, *supra*, 137 U.S.App.D.C. at 386, 424 F.2d at 874 (1970). Our decisions also make clear that in analyzing issues of administrative discretion, as in dealing with general questions of reviewability, we must be fully cognizant of the strong presumption in favor of judicial review. Environmental Defense Fund, Inc. v. Hardin, *supra*, 138 U.S.App.D.C. at 395-396, 428 F.2d at 1097-1098 (1970).

The Commission asserts that its enforcement activities pursuant to the proxy rules are entitled to particular deference because they partake of the nature of the prosecutorial function, which has traditionally been considered immune to judicial review.[14] This contention is meritorious, as will be seen below, but only in a limited sense; and the decisions of this court have never allowed the phrase "prosecutorial discretion" to be treated as a magical incantation which automatically provides a shield for arbitrariness. Indeed, we have explicitly alluded to the prosecutorial function in compelling an administrative agency to deal openly and fairly with public interest intervenors in licensing proceedings:

[A] "Public Intervenor" * * * is, in this context, more nearly like a complaining witness who presents evidence to the police or a prosecutor whose duty it is to conduct an affirmative and objective investigation of all the facts and to pursue his prosecutorial or regulatory function if there is probable cause to believe a violation has occurred.

\* · \* \* \* \*

The prosecuting power everywhere, whether exercised by police, by prosecutors, by regulatory agencies, or by other administrators, can and should be highly structured by both rules and precedents. * * *

\* \* \* \* \*

The American assumption that prosecutors' discretion should not be judicially reviewable developed when executive functions were generally unreviewable. The assumption is in need of reexamination in light of the twentieth-century discovery that courts can review executive action to protect against abuses while at the same time avoiding judicial assumption of the executive power.

---

13. 4 K. Davis, Administrative Law Treatise 33 (1958). We note that Professor Davis espouses a more restrictive role for the courts in reviewing the discretionary acts of administrative agencies than that which is urged by other scholarly commentators. *See, e. g.,* Berger, Administrative Arbitrariness: A Synthesis, 78 Yale L.J. 965 (1969), and authorities cited *id.* at 966 n. 9.

14. But *cf.* K. Davis, Discretionary Justice 225-226, 229 (1969):

In the regulatory agencies, abuse of the power to prosecute or not to prosecute may be ten times as frequent as abuse of the power of formal adjudication and therefore may be ten times as damaging to justice. * * *

* * * It was not the correct role of the Examiner or the Commission to sit back and simply provide a forum for the intervenors; the Commission's duties did not end by allowing Appellants to intervene; its duties began at that stage.

Office of Communication of the United Church of Christ v. FCC, 138 U.S.App. D.C. at 115, 425 F.2d at 546 (1969).

There is some reason to believe that similar judicial supervision of the administrative process is needed in circumstances like the present one, in order to assure that the investing public can obtain vigorous, efficient, and evenhanded implementation of the concepts of corporate democracy embodied in the proxy rules. One published study has accused the Commission of a variety of procedural sins in its regulation of proxies, most of which could be curtailed or eliminated through judicial review. Specifically, the Commission has been charged with repeatedly violating its own established procedural principles, particularly those relating to management's burden of proof in justifying the omission of proposals; of allowing non-lawyers to decide complex legal problems raised in proxy disputes; and of affording inconsistent treatment to similar factual situations for no apparent reason.[15] Perhaps the most serious charge against the Commission's secretive decision-making, however, is all too clearly illustrated by the record in the present case: the lack of articulated bases for past decisions encourages management to file shotgun objections to a shareholder proposal, urging every mildly plausible legal argument that inventive counsel can contrive,

in the hope that the Commission will accept one of them.[16] If the Commission does agree with one of management's arguments, or if it determines not to act against the company for other reasons, the shareholder often has no idea why his proposal was deemed unworthy or what he can do to cure its defects for subsequent proxy solicitations. Viewed in this light, "discretion" can be merely another manifestation of the venerable bureaucratic technique of exclusion by attrition, of disposing of controversies through calculated non-decisions that will eventually cause eager supplicants to give up in frustration and stop "bothering" the agency.

▮▮▮ Nevertheless, we recognize that there is a legitimate domain of administrative discretion in the proxy area, albeit not quite so broad as the Commission urges. As the Supreme Court has recognized, the Securities and Exchange Commission must process a formidable number of proxy statements in limited time and with insufficient manpower.[17] Obviously not all proxy proposals can or should be given detailed consideration by the full Commission, and even the boldest advocates of judicial review recognize that the agencies' internal management decisions and allocations of priorities are not a proper subject of inquiry by the courts.[18] However, that is definitely not what is at issue in the present case: here, the full Commission has exercised its discretion to review this controversy, and, as will be seen below, it has ostensibly acted in accord with a very dubious legal theory. The Medical Committee asks us merely to examine this allegedly

15. Clusserath, The Amended Stockholder Proposal Rule: A Decade Later, 40 N.D. Lawyer 13 (1964).

16. *See id.* at 43.

17. *Cf.* J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560 (1964): The Commission advises that it examines over 2,000 proxy statements annually and each of them must necessarily be expedited. Time does not permit an independent examination of the

facts set out in the proxy material and this results in the Commission's acceptance of the representations contained therein at their face value, unless contrary to other material on file with it.

18. *Cf.* Environmental Defense Fund, Inc. v. Hardin, *supra*, 138 U.S.App.D.C. at 397, 428 F.2d at 1099; Goldman, Administrative Delay and Judicial Relief, 66 Mich.L.Rev. 1423, 1426–1431 (1968).

erroneous legal premise and return the controversy to the Commission so that it may properly exercise its further discretion regarding the propriety and desirability of enforcement activity.[19]

■ Limited and partial review to examine the legal framework within which administrative discretion must be exercised is scarcely a doctrinal innovation; it has been repeatedly sustained by the Supreme Court. *See, e. g.,* Mc-Grath v. Kristensen, 340 U.S. 162, 169, 71 S.Ct. 224, 95 L.Ed. 173 (1950); Perkins v. Elg, 307 U.S. 325, 349–350, 59 S. Ct. 884, 83 L.Ed. 1320 (1939). We think that Justice Frankfurter's incisive observations in Rochester Telephone Corp. v. United States, 307 U.S. 125, 136, 59 S.Ct. 754, 760 (1939), are equally appropriate here:

> Judicial relief would be precisely the same as in the recognized instances of review by courts of Commission action: if the legal principles on which the Commission acted were not erroneous, the bill would be ordered dismissed; if the Commission was found to have proceeded on erroneous legal principles, the Commission would be ordered to proceed within the framework of its own discretionary authority on the indicated correct principles.

We foresee scant possibility that such sharply circumscribed review, which depends upon the Commission's initial determination to review the staff decision will cause the destruction of informal advisory and supervisory functions which the Commission now fears. The courts, we think, are abundantly capable of distinguishing between situations in which an agency gives informal advice and situations in which it formally decides among conflicting adversary claims premised on detailed legal arguments. Moreover, experience indicates that the grim forebodings which are frequently expressed in this court regarding the possibility that a particular decision will cause irreparable disruption of the administrative process only rarely, if ever, come to pass.[20]

■ On the other hand, if we were to foreclose review as the Commission urges, we would surely be condoning a frustration of congressional intent; for here the petitioner asserts that the Commission is failing to correct abuses which Congress sought to end by enacting the statute, and that it is a member of the class which Congress endeavored to protect in the Securities Act. In such situations, as a leading commentator has phrased it, "[i]nterests intended as the beneficiaries of legislative munificence will have cold comfort from embracing the dry, unmoving skeleton of the statute."[21] Review limited to the task of correcting such legal defects is consistent with the Supreme Court's interpretation of the Securities Act in J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555 (1964): "[A]mong [the] chief purposes [of section 14(a)] is

---

19. Were we to compel the Commission either to entertain administrative review of a staff decision in the first instance, or to undertake particular enforcement activity upon remand, our decision might well conflict with the precedents which the Commission has cited involving petitioners' attempts to have courts order the Commission to initiate investigations pursuant to different sections of the Act. *See* Dyer v. SEC, 291 F.2d 774 (8th Cir. 1961); Leighton v. SEC, 95 U.S.App. D.C. 217, 221 F.2d 91, cert. denied, 350 U.S. 825, 76 S.Ct. 54, 100 L.Ed. 737 (1955). We note, however, that other circuits in dealing with action by other agencies have occasionally circumscribed administrative discretion to undertake investigatory activities. *See, e. g.,* Trailways of New England, Inc. v. CAB, 412 F.2d 926, 931–933 (1st Cir. 1969).

20. *Cf.* Goodman v. United States, 138 U.S. App.D.C. 1, 5, 424 F.2d 914, 918 (1970): "Words like 'chaos' and 'impossible situation' fall readily from bureaucratic lips when confronted with the prospect of doing something not absolutely required by the book." *See also* Scanwell Laboratories, Inc. v. Shaffer, *supra*, 137 U.S. App.D.C. at 384–385, 424 F.2d 859 at 872–873 (1970).

21. Jaffe, The Individual Right to Initiate Administrative Process, 25 Iowa L.Rev. 485 (1940).

'the protection of investors,' which certainly implies the availability of judicial relief where necessary to achieve that result." Therefore, we conclude that partial review of the merits of this controversy will not project us into an area which is committed by law to agency discretion.

### III. THE MERITS OF PETITIONER'S PROPOSAL

The Medical Committee's sole substantive contention in this petition is that its proposed resolution could not, consistently with the Congressional intent underlying section 14(a), be properly deemed a proposal which is either motivated by *general* political and moral concerns, or related to the conduct of Dow's ordinary business operations. These criteria are two of the established exceptions to the general rule that management must include all properly submitted shareholder proposals in its proxy materials. They are contained in Rule 14a–8(c), 17 C.F.R. § 240.14a–8(c) (1970), which provides in relevant part:

> * * * [M]anagement may omit a proposal * * * from its proxy statement and form of proxy under any of the following circumstances:
>
> * * * * * *
>
> (2) If it clearly appears that the proposal is submitted by the security holder * * * primarily for the purpose of promoting general economic, political, racial, religious, social or similar causes; or
>
> * * * * * *
>
> (5) If the proposal consists of a recommendation or request that the management take action with respect to a matter relating to the conduct of the ordinary business operations of the issuer.

Despite the fact that our October 13 order in this case deferred resolution of the jurisdictional issue pending full argument on the merits (*see* part I, *supra*), the Commission has not deigned to address itself to any possible grounds for allowing management to exclude this proposal from its proxy statement. We confess to a similar puzzlement as to how the Commission reached the result which it did, and thus we are forced to remand the controversy for a more illuminating consideration and decision. *Cf.* Environmental Defense Fund, Inc. v. Hardin, *supra.* In aid of this consideration on remand, we feel constrained to explain our difficulties with the position taken by the company and endorsed by the Commission.

It is obvious to the point of banality to restate the proposition that Congress intended by its enactment of section 14 of the Securities Exchange Act of 1934 to give true vitality to the concept of corporate democracy. The depth of this commitment is reflected in the strong language employed in the legislative history:

> Even those who in former days managed great corporations were by reason of their personal contacts with their shareholders constantly aware of their responsibilities. But as management became divorced from ownership and came under the control of banking groups, men forgot that they were dealing with the savings of men and the making of profits became an impersonal thing. When men do not know the victims of their aggression they are not always conscious of their wrongs. * * *
>
> * * * * * *
>
> Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange. Managements of properties owned by the investing public should not be permitted to perpetuate themselves by the misuse of corporate proxies.

H.R.Rep. No. 1383, 73d Cong., 2d Sess. 5, 13 (1934). *See also* SEC v. Transamerica Corp., 163 F.2d 511, 517, 518 (3d Cir. 1947), cert. denied, 332 U.S. 847, 68 S. Ct. 351, 92 L.Ed. 418 (1948).

In striving to implement this open-ended mandate, the Commission has

gradually evolved its present proxy rules. Early exercises of the rule-making power were directed primarily toward the achievement of full and fair corporate disclosure regarding management proxy materials (*see, e. g.*, 3 Fed. Reg. 1991 (1938); 5 Fed.Reg. 174 (1940) ); the rationale underlying this development was the Commission's belief that the corporate practice of circulating proxy materials which failed to make reference to the fact that a shareholder intended to present a proposal at the annual meeting rendered the solicitation inherently misleading. *See* Hearings on Security and Exchange Commission Proxy Rules Before the House Comm. on Interstate and Foreign Commerce, 78th Cong., 1st Sess., pt. 1, at 169–170 (1943) [hereinafter "House Hearings"]. From this position, it was only a short step to a formal rule requiring management to include in its proxy statement any shareholder proposal which was "a proper subject for action by the security holders." 7 Fed.Reg. 10,659 (1942). It eventually became clear that the question of what constituted a "proper subject" for shareholder action was to be resolved by recourse to the law of the state in which the company had been incorporated; however, the paucity of applicable state law giving content to the concept of "proper subject" led the Commission to seek guidance from precedent existing in jurisdictions which had a highly developed commercial and corporate law and to develop its own "common law" relating to proper subjects for shareholder action. *See generally* II L. Loss, Securities Regulation 905–906 (1961); Hearings on SEC Enforcement Problems Before a Subcom. of the Senate Comm. on Banking and Currency, 85th Cong., 1st Sess., pt. 1, at 118 (1957) [hereinafter "Senate Hearings"].

Further areas of difficulty became apparent as experience was gained in administering the "proper subject" test,

and these conflicts provided the Commission with opportunities to put a detailed gloss upon the general phraseology of its rules. Thus, in 1945 the Commission issued a release containing an opinion of the Director of the Division of Corporation Finance that was rendered in response to a management request to omit shareholder resolutions which bore little or no relationship to the company's affairs; for example, these shareholder resolutions included proposals "that the anti-trust laws and the enforcement thereof be revised," and "that all Federal legislation hereafter enacted providing for workers and farmers to be represented should be made to apply equally to investors." [22] The Commission's release endorsed the Director's conclusion that "proposals which deal with general political, social or economic matters are not, within the meaning of the rule, 'proper subjects for action by security holders.' " [23] The reason for this conclusion was summarized as follows in the Director's opinion:

> Speaking generally, *it is the purpose of Rule X–14A–7 to place stockholders in a position to bring before their fellow stockholders matters of concern to them as stockholders in such corporation;* that is, such matters relating to the affairs of the company concerned as are proper subjects for stockholders' action under the laws of the state under which it was organized. It was not the intent of Rule X–14A–7 to permit stockholders to obtain the consensus of other stockholders with respect to matters which are of a general political, social or economic nature. *Other forums exist for the presentation of such views.*[24]

Several years after the Commission issued this release, it was confronted with the same kind of problem when the management of a national bus company sought to omit a shareholder proposal phrased as "A Recommendation that

---

22. Securities Exchange Act Release No. 3638 (Jan. 3, 1945), Brief for Petitioner at Addendum p. 2–3.

23. *Id.* at Addendum p. 2.

24. *Id.* at Addendum p. 3 (emphasis added).

Management Consider the Advisability of Abolishing the Segregated Seating System in the South"—a proposal which, on its face, was ambiguous with respect to whether it was limited solely to company policy rather than attacking all segregated seating, and which quite likely would have brought the company into violation of state laws then assumed to be valid.[25] The Commission staff approved management's decision to omit the proposal, and the shareholder then sought a temporary injunction against the company's solicitation in a federal district court. The injunction was denied because the plaintiff had failed to exhaust his administrative remedies or to show that he would be irreparably harmed by refusal to grant the requested relief. Peck v. Greyhound Corp., 97 F.Supp. 679 (S.D.N.Y.1951). The Commission amended its rules the following year to encompass the above-quoted exception for situations in which "it clearly appears that the proposal is submitted by the security holder * * * primarily for the purpose of promoting general economic, political, racial, religious, social or similar causes." 17 Fed.Reg. 11,433 (1952); *see also id* at 11,431. So far as we have been able to determine, the Commission's interpretation or application of this rule has not been considered by the courts.

The origins and genesis of the exception for proposals "relating to the conduct of the ordinary business operations of the issuer" are somewhat more obscure. This provision was introduced into the proxy rules in 1954, as part of amendments which were made to clarify the general proposition that the primary source of authority for determining whether a proposal is a proper subject for shareholder action is state law. *See* 19 Fed.Reg. 246 (1954). Shortly after the rule was adopted, the Commission explained its purpose to Congress in the following terms:

> The policy motivating the Commission in adopting the rule * * * is basically the same as the underlying policy of most State corporation laws to confine the solution of ordinary business problems to the board of directors and place such problems beyond the competence and direction of the shareholders. The basic reason for this policy is that it is manifestly impracticable in most cases for stockholders to decide management problems at corporate meetings.
>
> * * * * * *
>
> * * * While Rule X–14A–8 does not require that the ordinary business operations be determined on the basis of State law, the premise of Rule X–14A–8 is that the propriety of * * * proposals for inclusion in the proxy statement is to be determined in general by the law of the State of incorporation. * * * Consistency with this premise requires that the phrase "ordinary business operations" in Rule X–14A–8 have the meaning attributed to it under applicable State law. To hold otherwise would be to introduce into the rule the possibility of endless and narrow interpretations based on no ascertainable standards.

(Senate Hearings at 118.) It also appears that no administrative interpretation of this exception has yet been scrutinized by the courts.

These two exceptions are, on their face, consistent with the legislative purpose underlying section 14; for it seems fair to infer that Congress desired to make proxy solicitations a vehicle for *corporate* democracy rather than an all-purpose forum for malcontented shareholders to vent their spleen about irrelevant matters,[26] and also realized that

---

25. *See* Emerson & Latcham, The SEC Proxy Proposal Rule: The Corporate Gadfly, 19 U.Chi.L.Rev. 807, 833 (1952); Cong.Rec. E–2149 (daily ed. March 17, 1970).

26. *See, e. g.*, the following colloquy, which appears in House Hearings at 162–63:
 Mr. Boren. So one man, if he owned one share in A.T. & T. * * * and another share in R.C.A. * * * if he

management cannot exercise its specialized talents effectively if corporate investors assert the power to dictate the minutiae of daily business decisions. However, it is also apparent that the two exceptions which these rules carve out of the general requirement of inclusion can be construed so as to permit the exclusion of practically any shareholder proposal on the grounds that it is either "too general" or "too specific." Indeed, in the present case Dow Chemical Company attempted to impale the Medical Committee's proposal on both horns of this dilemma: in its memorandum of counsel, it argued that the Medical Committee's proposal was a matter of ordinary business operations properly within the sphere of management expertise and, at the same time, that the proposal clearly had been submitted primarily for the purpose of promoting general political or social causes. (App. 9a–10a; *see also id.* at 19a.) As noted above, the Division of Corporation Finance made no attempt to choose between these potentially conflicting arguments, but rather merely accepted Dow Chemical's decision to omit the proposal "[f]or reasons stated in [the company's] letter and the accompanying opinion of counsel, both dated January 17, 1969"; [27] this determination was then adopted by the full Commission. Close examination of the company's arguments only increases doubt as to the reasoning processes which led the Commission to this result.

In contending that the Medical Committee's proposal was properly excludable under Rule 14a–8(c)(5), Dow's counsel asserted:

> It is my opinion that *the determination of the products which the company shall manufacture,* the customers to which it shall sell the products, and the conditions under which it shall make such sales are related to the conduct of the ordinary business operations of the Company and that any attempt to amend the Certificate of Incorporation to define the circumstances under which the management of the Company shall make such determinations is contrary to the concept of corporate management, which is inherent in the Delaware General Corporation Act under which the Company is organized.[28]

---

decided deliberately * * * to become a professional stockholder in each one of the companies—he could have a hundred-word propaganda statement prepared and he could put it in every one of these proxy statements. Suppose he were a Communist.

Commissioner Purcell. That is possible. We have never seen such a case.

Mr. Boren. Suppose a man were a Communist and he wanted to send to all of the stockholders of all of these firms, a philosophic statement of 100 words in length, or a propaganda statement. * * * He could by the mere device of buying one share of stock * * * have available to him the mailing list of all the stockholders in the Radio Corporation of America.

\* \* \* \* \*

Commissioner Purcell. Of course, we have never seen such a case; and if such a case came before us, then we would have to deal with it and make such appropriate changes as might seem necessary. * * *

27. App. 20a. The letter referred to by the Division merely contains a citation to the proxy rules and a reference to the opinion of counsel (see App. 12a); thus, for present purposes the only relevant argument is that contained in the memorandum of counsel.

28. App. 9a (emphasis added). The remainder of the company's argument under Rule 14a–8(c) (5) reads as follows, in its entirety:

Moreover, there is considerable doubt as to the efficacy of the proposed limitation in the context of the ability of the Government of the United States to issue a directive that the Company manufacture napalm. Therefore, the proposed limitation could conceivably be contrary to the requirements of the Defense Production Act of 1950.

(App. 9a–10a.) In response to this contention, the Medical Committee pointed out that "any such amendment would, of course, be subject to the requirements of the 'Defense Production Act of 1950,' as are the corporate charters and management decisions of all United States Corporations." (App. 16a.) No rebuttal by Dow was forthcoming.

In the first place, it seems extremely dubious that this superficial analysis complies with the Commission's longstanding requirements that management must sustain the burden of proof when asserting that a shareholder proposal may properly be omitted from the proxy statement, and that "[w]here management contends that a proposal may be omitted because it is not proper under State law, it will be incumbent upon management to refer to the applicable statute or case law." 19 Fed.Reg. 246 (1954). As noted above, the Commission has formally represented to Congress that Rule 14a–8(c) (5) is intended to make state law the governing authority in determining what matters are ordinary business operations immune from shareholder control; yet, the Delaware General Corporation law provides that a company's Certificate of Incorporation may be amended to "change, substitute, enlarge or diminish the nature of [the company's] business." [29] If there are valid reasons why the Medical Committee's proposal does not fit within the language and spirit of this provision, they certainly do not appear in the record.

The possibility that the Medical Committee's proposal could properly be omitted under Rule 14a–8(c) (2) appears somewhat more substantial in the circumstances of the instant case, although once again it may fairly be asked how Dow Chemical's arguments on this point could be deemed a rational basis for such a result: the paragraph in the company's memorandum of counsel purporting to deal with this issue, which is set forth in the margin,[30] consists entirely of a fundamentally irrelevant recitation of some of the political protests which had been directed at the company because of its manufacture of napalm, followed by the abrupt conclusion that management is therefore entitled to exclude the Medical Committee's proposal from its proxy statement. Our own examination of the issue raises substantial questions as to whether an interpretation of Rule 14a–8(c) (2) which permitted omission of this proposal as one motivated primarily by *general* political or social concerns would conflict with the congressional intent underlying section 14(a) of the Act.

As our earlier discussion indicates, the clear import of the language, legislative history, and record of administration of section 14(a) is that its overriding purpose is to assure to corporate shareholders the ability to exercise their right —some would say their duty [31]—to con-

**29.** Chapter 1, Title 8 Delaware Code §§ 242(a) (2), 242(d) (1968 Cum.Supp.). *Cf.* II L.Loss, Securities Regulation 906 (1961): "Inevitably the Commission, while purporting to find and apply a generally nonexistent state law, has been building up a 'common law' of its own as to what constitutes a 'proper subject' for shareholder action. It is a 'common law' which undoubtedly would yield, as it should, to a contrary decision of the particular state court."

**30.** App. 10a:
It is a well-known fact that the Company has been the target of protests and demonstrations for the past few years at its office and plant locations, and on the occasion of recruiting on college and university campuses, as well as at its annual meeting of stockholders held May 8, 1968. The various protests and demonstrations are a reflection of opposition on the part of certain segments of the population against the poli-

cy of the United States Government in waging the war in Viet Nam. Although The Dow Chemical Company was not among the 100 largest prime contractors with the Department of Defense during the 1967–68 Government fiscal year and was only 75th on the list in the 1966–67 fiscal year, it appears to have been singled out symbolically by the protesters. Under all of these circumstances it is my opinion that it clearly appears that the proposal is primarily for the purpose of promoting a general political, social or similar cause.

**31.** *See* Bayne, The Basic Rationale of Proper Subject, 34 U.Det.L.J. 575, 579 (1957):
In so far as the shareholder has contributed an asset of value to the corporate venture, in so far as he has handed over his goods and property and money for use and increase, he has not only the clear right, but more to the point, perhaps, he has the stringent duty to

trol the important decisions which affect them in their capacity as stockholders and owners of the corporation. Thus, the Third Circuit has cogently summarized the philosophy of section 14(a) in the statement that "[a] corporation is run for the benefit of its stockholders and not for that of its managers." SEC v. Transamerica Corp., 163 F.2d 511, 517 (3d Cir. 1947), cert. denied, 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 418 (1948). Here, in contrast to the situations detailed above which led to the promulgation of Rule 14a–8(c) (2), the proposal relates solely to a matter that is completely within the accepted sphere of corporate activity and control. No reason has been advanced in the present proceedings which leads to the conclusion that management may properly place obstacles in the path of shareholders who wish to present to their co-owners, in accord with applicable state law, the question of whether they wish to have their assets used in a manner which they believe to be more socially responsible but possibly less profitable than that which is dictated by present company policy. Thus, even accepting Dow's characterization of the purpose and intent of the Medical Committee's proposal, there is a strong argument that permitting the company to exclude it would contravene the purpose of section 14(a).

However, the record in this case contains indications that we are confronted with quite a different situation. The management of Dow Chemical Company is repeatedly quoted in sources which include the company's own publications as proclaiming that the decision to continue manufacturing and marketing napalm was made not *because* of business considerations, but *in spite of* them; that management in essence decided to pursue a course of activity which generated little profit for the shareholders and actively impaired the company's public relations and recruitment activities because management considered this action morally and politically desirable. (App. 40a–43a; *see also id.* at 33.) The proper political and social role of modern corporations is, of course, a matter of philosophical argument extending far beyond the scope of our present concern; the substantive wisdom or propriety of particular corporate political decisions is also completely irrelevant to the resolution of the present controversy. What *is* of immediate concern, however, is the question of whether the corporate proxy rules can be employed as a shield to isolate such managerial decisions from shareholder control.[32] After all, it must be remembered that "[t]he control of great corporations by a very few persons was the abuse at which Congress struck in enacting Section 14(a)." SEC v. Transamerica Corp., *supra*, 163 F.2d at 518. We think that there is a clear and compelling distinction between management's legitimate need for freedom to apply its expertise in matters of day-to-day business judgment, and management's patently illegitimate claim of power to treat modern corporations with their vast resources as personal satrapies implementing personal political or moral predilections. It could scarcely be argued that management is more qualified or more entitled to make these kinds of decisions than the shareholders who are the true beneficial owners of the corporation; and it seems equally implausible that an application of the proxy rules which permitted such a result could be harmonized with the philosophy of corporate democracy which Congress embodied in section 14(a) of the Securities Exchange Act of 1934.

exercise control over that asset for which he must keep care, guard, guide, and in general be held seriously responsible.

\* \* \* As much as one may surrender the immediate disposition of [his] goods, he can never shirk a supervisory and secondary duty (not just a right) to make sure these goods are used justly, morally and beneficially.

32. *Cf.* Note, Corporate Political Affairs Programs, 70 Yale L.J. 821, 846–847 (1961).

In light of these considerations, therefore, the cause must be remanded to the Commission so that it may reconsider petitioner's claim within the proper limits of its discretionary authority as set forth above, and so that "the basis for [its] decision [may] appear clearly on the record, not in conclusory terms but in sufficient detail to permit prompt and effective review." [33]

Remanded for further proceedings consistent with this opinion.

33. Environmental Defense Fund, Inc. v. Hardin, *supra* 139 U.S.App.D.C. at ——, 428 F.2d at 1100 (1970).