**PHILLIPS PETROLEUM COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

**PHILLIPS PETROLEUM COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

**Nos. 5095, 5096.**

United States Court of Appeals
Tenth Circuit.

Nov. 16, 1955.

Kenneth Heady, Bartlesville, Okl., (Rayburn L. Foster, Harry D. Turner, H. K. Hudson and James G. Williams, Jr., Bartlesville, Okl., were with him on the brief), for petitioner.

Lambert McAllister, Washington, D. C. (Willard W. Gatchell, Abraham R. Spalter and Francis J. Walsh, Washington, D. C., were with him on the brief), for respondent.

Charles V. Shannon, Washington, D. C. (John Dern, Arthur R. Seder, Jr., Chicago, Ill., and Knowles & Shaw, Denver, Colo., were with him on the brief),

for Intervenor Michigan Wisconsin Pipe Line Co.

Before BRATTON, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

These are petitions under Section 19 (b), 15 U.S.C.A. § 717r(b), of the Natural Gas Act, 52 Stat. 821, to review and set aside orders of the Federal Power Commission, purporting to suspend certain rate schedules filed or offered for filing with the Commission for natural gas sold by the petitioner, Phillips Petroleum Company, an independent producer of natural gas, to Michigan Wisconsin Pipe Line Company, for resale. While the appeals were consolidated and come to us on one record, only one question of law is common to both cases, and we will therefore consider them separately.

### Number 5096.

An historical statement is essential to a clear perception of the questions involved. On December 11, 1945, and before Michigan commenced operations, Phillips entered into a contract with it for the sale of natural gas, to be delivered at its Hansford County, Texas, processing plant. This review is concerned only with the production and sale of natural gas from lands referred to in the contract as "dedicated acreage". The contract, as amended December 1, 1949 provided for a base price of 6.6997¢ per mcf, to be escalated in the same ratio as Michigan's resale rates exceeded 25¢ per mcf, if the Bureau of Labor Statistics Wholesale Price Index was thirty points higher than its December 1934 level, but in no event would Phillips' price during the first five years be less than 7.5930¢ per mcf. Until March 1951, Phillips' sale price to Michigan under the contract was the minimum. In that month, however, Michigan applied for an increase in its rates from 28¢ to 31.5¢ per mcf. This rate was suspended by the Commission under Section 4(e) of the Act, 52 Stat. 822, 15 U.S.C.A. § 717c (e), and a hearing to determine a reasonable rate was ordered under Docket No.

G–1678. While that case was pending, and in October 1951, the suspension order having expired under Section 4(e), Michigan began charging its customers the increased rate of 31.5¢ under bond to refund any portion of the increased rates ultimately found not to be justified after the hearing. In accordance with the "formula in the contract" between Phillips and Michigan, the parties entered into a letter agreement, under the terms of which Phillips' unregulated rates to Michigan were adjusted upwards in ratio to Michigan's increased rates, subject to refund to the extent that Michigan's increased rates were not sustained by the Commission. The formula prescribed in the contract gave Phillips a rate of 8.4416¢ per mcf (31.5/25 x 6.6997) for its unregulated sales to Michigan.

In June 1952, and while the first proceedings were still pending, Michigan filed another application for a further rate increase from 31.5¢ to 35¢ per mcf. This rate was also suspended and a hearing ordered under Docket No. G–1996. Upon the expiration of the statutory suspension period (December 12, 1952), Michigan commenced charging its customers the increased rate of 35¢, and thereupon entered into another like letter agreement with Phillips providing for an upward adjustment of Phillips' sale price in accordance with the escalator clause of its original contract, as amended. Effective January 1953, Michigan accordingly paid Phillips 9.3753¢ per mcf for its gas, subject to refund to the extent that Michigan's increased rate was not ultimately sustained by the Commission. And, Phillips was being paid this unregulated contract rate for its sales to Michigan when, on June 7, 1954, it was authoritatively determined that such sales were within the regulatory jurisdiction of the Commission. See Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L. Ed. 1035.

In recognition of its newly established jurisdiction, the Commission, on August 6, 1954, promulgated additional regula- tions in which it established June 7, 1954, as the arbitrary cut-off date on which all rate schedules for the sale of natural gas or services subject to the jurisdiction of the Commission were frozen. Every independent producer of natural gas subject to the jurisdiction of the Commission was ordered to, on or before October 1, 1954, file with the Commission rate schedules setting forth the terms and conditions of service and all rates and charges for such transportation and sale of natural gas effective on June 7, 1954, to be evidenced by a statement showing actual billings for a recent month; and it was further provided that no change could be made in any such rate schedules without first filing a change in rates at least thirty days before the effective date thereof pursuant to Section 4(d) of the Natural Gas Act and the applicable regulations. And, "rate schedule" was specifically defined as the basic contract and all supplements or agreements amendatory thereof effective and applicable on or after June 7, 1954. See Regulations 154.92–4, 19 F.R. 5081.

In compliance with these regulations, Phillips filed numerous contracts with amendments and supplements reflecting rates and charges in effect on June 7, 1954 for the wholesale of natural gas subject to the jurisdiction of the Commission. Among the contracts filed on August 31, 1954 as Rate Schedule No. 4 was the contract with Michigan dated December 11, 1945, together with the amendments of August 9, 1948 and December 1, 1949 and the letter agreements of October 31, 1951 and January 15, 1953. As a part of the same schedule, Phillips filed changes in its rate schedule to permit it to recover, in accordance with its contract with Michigan, seventy-five per cent of the increase in the Texas gross production tax, effective September 1, 1945. The letter agreements were denominated by the Commission as Supplements Nos. 8 and 11. The proposals for rate increases to cover the increase in the Texas gross production tax were denominated Supplement No. 1 to Supplements Nos. 6 and 7.

On September 30, 1954, the thirtieth day after the filing of Rate Schedule No. 4, the Commission sent a telegram to Phillips stating: "Supplemental rate schedule filed on August 31, 1954 suspended pending investigation and further order of the Commission. Two orders follow by mail." On the next day, October 1st, the Commission entered a formal order reciting that the "rate increases proposed by Phillips in Supplements Nos. 8 and 11 [the two letter agreements] and Supplement No. 1 to Supplements Nos. 6 and 7 [pertaining to the recovery of the Texas excise tax] to FPC gas rate Schedule No. 4 has not been shown to be justified and may be unjust, unreasonable and otherwise unlawful." And, "furthermore, the rate increases proposed in Supplements Nos. 8 and 11 relate to matters considered in Opinion No. 275 in the Matter of Michigan Wisconsin Pipe Line Company, Dockets Nos. G–1678 and G–1996, and accompanying order issued July 30, 1954." The Commission having granted a rehearing in Opinion No. 275, and Phillips' wholesales to Michigan having become jurisdictionally relevant to Michigan's resales, it was deemed "proper and in the public interest that pending such reconsideration the rate increases filed by Phillips applicable to gas purchased by Michigan be suspended." Treating the letter agreements (Supplements Nos. 8 and 11) as proposals for rate increases not in effect June 7, 1954, the Commission suspended the rates being collected in accordance therewith, and ordered a hearing "concerning the lawfulness of the rates, charges, classifications and services contained in Phillips FPC Gas Rate Schedule No. 4, as supplemented, as proposed to be further supplemented by Supplements Nos. 8 and 11 and Supplement No. 1 to Supplements Nos. 6 and 7."

On rehearing, the Commission entered its second order of December 8, 1954, modifying in part its prior order of October 1st. After referring to and quoting from its prior order concerning the relevancy of Phillips wholesales to Michigan's resales, the Commission noted that since its October 1st order, it had, on November 29th, issued its Opinion No. 275A and accompanying order modifying its prior Opinion No. 275, in which it recognized that failure to accord Phillips some increase in its sale price under the escalator clause of its contract "would carve out an unwarranted exception to the policy established" under its applicable regulations, and would "be somewhat unfair to Phillips when compared to the treatment accorded other independent producers * * *." The Commission accordingly found that on the basis of equal treatment with other producers, Phillips was equitably entitled to a rate which would give effect to Michigan's resale rate of 31.25¢, which the Commission had found to be proper in its Opinion No. 275A. Phillips was accordingly granted permission to file a new supplement to its FPC Gas Rate Schedule No. 4 to reflect as of June 7, 1954 a rate of 8.374¢ for its gas sales involved in this appeal. And, Supplement No. 1 to Supplements Nos. 6 and 7 providing for increase in rates based upon the increase in the Texas gross production tax, were allowed to take effect, provided that the filing of the new supplemental rate schedule should in no way affect the pending proceedings involving Phillips' wholesale rates to Michigan.

After denial of the petition for rehearing, Phillips tendered a timely conditional rate schedule, which the Commission found did not comply with the requirements of its order of December 8, 1954 by reason of which the tendered filing was rejected. Petitions for rehearing on the Commission's order of October 1, 1954 and December 8, 1954 having been denied, Phillips filed its timely petitions for review here.

The first contention is to the effect that the order of October 1st, not having been entered within the thirty-day statutory period from the date of the filing of the rate schedules on August 31st, was ineffectual under Section 4(e) of the Act to suspend the rate filings. Section 4(e) provides in presently mate-

rial part: "Whenever any such new schedule is filed the Commission shall have authority * * * to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect: * * *." It is of course true that the Commission is empowered under this Section to suspend rates only before they become effective, and that they become effective thirty days after filing. The question then arises whether the telegram dispatched to Phillips within the statutory period can be said to meet the statutory requirements.

█ The obvious purpose for granting suspension powers to the Commission was to provide a status quo of five months during which the Commission could investigate the reasonableness of the proposed new rate schedule. And while concededly the Commission was required to act to suspend the rates within thirty days from the filing, the statute prescribes no form of notice or order beyond the requirement that it shall be "a statement in writing of its reasons for such suspension", and that it shall be filed with the schedules and delivered to the natural gas company affected. There is no reason to imply a technical concept of the notice of suspension. It would seem sufficient if the natural gas company is apprised of the suspension in writing in order that the commencement of the period of status quo may be definitely fixed for the governance of the parties. A telegram is certainly a "writing" within the meaning of the statute. It referred to the rate schedules filed on August 31st and it stated that they were suspended. The statute also requires a reason for such suspension, and the tele-

gram stated that the schedules were suspended pending investigation and further order of the Commission, and that "two orders follow by mail." The order which followed the next day was merely an amendment or enlargement of the reasons for the suspension order promulgated within the thirty-day period. We think it related back to the telegram, and, considered together, met the statutory requirements.

█ The Commission challenges the reviewability of the suspension orders for lack of requisite finality and definitiveness. Section 19(b) of the Act authorizes review of "an order issued by the Commission." Reviewability is thus not strictly limited to final orders. But the courts have been traditionally careful not to interfere with the administrative process, confining review to "orders of a definitive character dealing with the merits of a proceeding before the Commission and resulting from a hearing upon evidence * * *." Federal Power Commission v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 967, 82 L.Ed. 1408. See also Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147; Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563; Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568; Isbrandtsen Co., Inc., v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51; Arrow Airways, Inc., v. Civil Aeronautics Board, 87 U.S.App.D.C. 71, 182 F.2d 705; United Gas Pipe Line Co. v. Federal Power Commission, 86 U.S.App.D.C. 314, 181 F.2d 796. But, "The ultimate test of reviewability is not found in an overrefined technique." Columbia Broadcasting System v. United States, supra, 316 U.S. at page 425, 62 S.Ct. at page 1204. And, reviewability extends to an order issued by the Commission which finally determines the legal rights of the parties with respect to matters within the scope of review. See Atlantic Seaboard Corp. v. Federal Power Commission, 4 Cir., 201 F.2d 568; Algonquin Gas

Transmission Co. v. Federal Power Commission, 1 Cir., 201 F.2d 334.

■ The orders sought to be reviewed here do not deal with the merits of the proceedings before the Commission in the sense that they were entered upon evidence concerning the reasonableness of the rates. They do not purport to finally determine Phillips' wholesale rates. That matter is left to a conventional hearing in these proceedings. But the orders do purport to establish with finality the wholesale rates which Phillips was authorized to charge Michigan on June 7, 1954 and thereafter until changed by order of the Commission pursuant to hearing. The correctness of that order depends upon the legal effect of the writings between the parties. If they are to be considered together as one contract to establish an applicable and effective rate on June 7, 1954, the Commission obviously had no power to suspend it. If, on the other hand, the letter agreements are to be construed apart from the amended contract as mere proposals for rate increases, the Commission was empowered to suspend such rates. In any event, the legal consequences which attach to these orders have conclusive effect upon the rights and duties of Phillips as an independent producer under the Natural Gas Act and they are therefore reviewable.

This brings us to a construction of the gas sales contract as of June 7, 1954, and more particularly the legal effect of the escalator clause of the contract as amended, and as construed and applied in the letter agreements denominated in the Commission's order as Supplements Nos. 8 and 11. Throughout these proceedings the Commission has taken the position that in view of the contingency of the rates charged by Phillips on June 7, 1954 under the letter agreements, they could in no sense be said to be effective rates on that crucial date. Indeed, the Commission took the position that no escalator provisions in a gas purchase contract between Phillips and Michigan could effect an automatic change in the price which Phillips could charge.

And, this conclusion is said to be entirely consistent with its historically approved policy of suspending all automatic rate increases provided for in escalator clauses of contracts filed as rate schedules, on the grounds that such clauses constituted a new schedule or change in rates under Section 4(d). And see In the Matter of United Gas Pipe Line Co., Docket No. G-144 (2 FPC 723), issued Nov. 20, 1939; In the Matter of Southern Carbon Co., Docket No. G-145 (2 FPC 725), issued Nov. 20, 1939; In the Matter of Interstate Natural Gas Co., Inc. and Hope Producing Co., Docket No. G-146 (2 FPC 272), issued Nov. 20, 1939; and In the Matter of Mississippi River Fuel Corp., Docket No. G-150 (2 FPC 170), issued Dec. 28, 1939, affirmed, Mississippi River Fuel Corp. v. Federal Power Comm., 8 Cir., 121 F. 2d 159. But, it is one thing to treat an escalated rate effective after June 7, 1954 as a change in rate or new schedule. It is quite another to treat a rate already in force on June 7, 1954 by virtue of the automatic provisions of an escalator clause in a contract as a new schedule or change in rates.

■ It is true, as the Commission argues, that the rate paid Phillips on June 7, 1954 under its contract was tentative in the sense that it was contingent upon the ultimate resale rate established by the Commission for Michigan. But it was nonetheless in force and effect and was being paid not by force of letter agreements, but by force of the binding effect of the escalator clauses which operated to fix the prescribed rate in accordance with the formula in the contract. The letter agreements were merely executory of the contract between the parties. The contract and letter agreements were entered into at a time when the parties were free to contract with respect to the sale of gas, and the fact that they were contingent upon Michigan's regulated resale rate does not make them any the less applicable and effective to the extent that the regulatory process permitted. When the Commission ultimately determined Michigan's rates to

be 31.25¢ per mcf from September 1951 to December 1952, and 31.60¢ thereafter, Phillips' wholesale rate, effective June 7, 1954, was finally and definitely established under the contract. It was less than what they were collecting and Phillips has made refunds in accordance with its contracts. It is significant that the Commission's regulations provided for the filing of all contracts, amendments and supplements as a part of the rate schedules required to be filed reflecting rates applicable on June 7, 1954. The contracts and amendments, including the letter agreements, were filed with the Commission in accordance with the regulations as one rate schedule; they were integrated parts of one contract, the terms and conditions of which operated to establish a determinable rate of 8.4684¢ as of June 7, 1954, and that rate, being applicable and effective on that date, is not subject to suspension under Section 4(e).

Michigan has intervened to contend that the rate order pursuant to Opinions 275 and 275A (In the Matter of Michigan Wisconsin Pipe Line Co., Dockets Nos. G–1678 and G–1996) the substance of which we have already recited, operated to conclusively establish the rate which Phillips could charge Michigan, and that this petition is therefore an unwarranted collateral attack on that rate order. On the basis of Michigan's adjudicated resale rate of 31.25¢ per mcf from September 1951 to December 1952, the Commission allowed Phillips a rate, effective June 7, 1954, of 8.374¢, and using that wholesale rate as a cost basis, the Commission allowed Michigan a resale rate of 31.60¢ from and after December 12, 1952. The rate thus allowed Phillips bore no relationship to the contracts in force on June 7, 1954, but was concededly an equitable gratuity, justi-

fied only as an authorized administrative adjustment. Phillips was not a party to the proceedings which purported to fix its rates, and we can find no warrant in the Natural Gas Act for the determination of its rates and charges in a proceedings to which it was not a party. Moreover, since we hold that Phillips' applicable and effective rate on June 7, 1954 was 8.4684¢, it follows that any other rate was unauthorized and cannot be sustained.

We hold, therefore, that the orders of October 1st and December 8th were timely; that they were subject to review under Section 19(b) as presenting purely questions of law involving the construction of a contract; that the original contract, as amended, together with the letter agreements are all integrated parts of one contract, the escalator provisions of which operated to establish Phillips' wholesale rate to Michigan effective June 7, 1954, and such rates are therefore not suspendible under Section 4(e); that in its order of December 8th, the Commission has in effect upon its own motion entered upon an authorized investigation of Phillips' rates to Michigan; that it has full authority to inquire into their reasonableness, subject to the effective contract rate on June 7, 1954, and to make appropriate and appealable orders therein; that the orders pursuant to Opinions Nos. 275 and 275A have no binding effect upon the issues involved here.

### Number 5095.

This petition involves only the timeliness and legal sufficiency of the Commission's telegraphic notice on September 30, 1954, reference to which has already been made in Number 5096. What we have said there is dispositive of the question here, and it is so ordered.