922 F.2d 865
 287 U.S.App.D.C. 337
 TRANSCONTINENTAL GAS PIPE LINE CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Public Service Commission of the State of N.Y., Public
Service Electric and Gas Company, Brooklyn Union Gas
Company, Washington Gas Light Company, North Carolina
Utilities Commission, North Carolina Natural Gas
Corporation, Public Service Company of North Carolina, Inc.,
Intervenors.
ELIZABETHTOWN GAS COMPANY, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Brooklyn Union Gas Company, Process Gas Consumers Group, et
al., North Carolina Natural Gas Corporation,
Public Service Company of North
Carolina, Inc., Intervenors.
 Nos. 89-1367, 89-1417.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 9, 1990.
Decided Jan. 11, 1991.
 
 Petitions for Review of Orders of the Federal Energy Regulatory Commission.
 Michael J. Fremuth, with whom Robert G. Hardy and Anthony J. Ivancovich, Washington, D.C. were on the brief, for petitioner Transcontinental Gas Pipe Line Corp. in No. 89-1367 and intervenor in No. 89-1417.
 John T. Miller, Jr., with whom William I. Harkaway and Harvey L. Reiter, Washington, D.C. for Consolidated Edison Co. of N.Y., Rebecca S. Haney, James F. Bowe, Jr., and O. Julia Weller, Washington, D.C., for Long Island Lighting Co., Steven A. Taube, Washington, D.C. for Philadelphia Gas Works, Mary E. Baluss, Washington, D.C. for Philadelphia Elec. Co., Barbara K. Heffernan, Washington, D.C. for Delmarva Power & Light Co., Jerry W. Amos, Greensboro, N.C. for Piedmont Natural Gas Co., Inc., Telemac N. Chryssikos, Washington, D.C. for Washington Gas Light Co., and James R. Lacey, Glen Ridge, N.J. for Public Service Elect. and Gas Co. were on the joint brief, for petitioners Elizabethtown Gas Co., et al., in No. 89-1417 and intervenors in No. 89-1367.
 Catherine C. Cook, Attorney, F.E.R.C., for respondent. Joseph S. Davies, Deputy Sol., and Timm L. Abendroth, Atty., F.E.R.C., Washington, D.C., were on the brief for respondent in No. 89-1367 and No. 89-1417.
 Richard A. Solomon and David D'Alessandro, Washington, D.C. entered appearances for intervenor Public Service Com'n of the State of N.Y.
 Richard H. Davidson, Gregory Grady, Washington, D.C., Donald W. McCoy, Fayetteville, N.C., and F. Kent Burns, Raleigh, N.C. entered appearances for intervenor North Carolina Natural Gas Corp., et al.
 Michael W. Hall, Washington, D.C. entered an appearance for intervenor Brooklyn Union Gas Co.
 Frank H. Strickler, Gordon M. Grant, and Ralph E. Fisher, Washington, D.C. entered appearances for intervenor Elizabethtown Gas Co., et al.
 Morton L. Simons, Washington, D.C. entered an appearance for intervenor North Carolina Utilities Com'n.
 William R. Hoatson, Newark, N.J. entered an appearance for intervenor Public Service Elec. and Gas Co.
 Before BUCKLEY, SENTELLE, and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 This case is the consolidation of two challenges to orders of the Federal Energy Regulatory Commission ("FERC" or "the Commission") directing Transcontinental Gas Pipe Line Corporation ("Transco") to refund fuel retainage costs it charged to local gas distribution companies ("LDCs") for the period of April 1, 1984 to April 1, 1987. Transco petitions for review of these orders, arguing that the fuel retention rates for that time period were previously resolved in a settlement agreement between the parties and therefore were not a proper subject before the Commission, and that the Commission lacked authority to authorize refunds under that settlement agreement. The LDCs challenge the orders on the grounds that the Commission erred in limiting refunds to the three-year refund period. We deny both petitions.
 
 I. BACKGROUND
 
 2
 On September 30, 1983, Transco filed for a general rate increase pursuant to Section 4(e) of the Natural Gas Act, 15 U.S.C. Sec. 717c(e). This filing, Docket No. RP83-137-000 ("RP83-137") proposed, inter alia, revisions to Transco's Rate Schedule for interruptible transportation service, Schedule T-I, and a new Rate Schedule for those customers who did not qualify for interruptible transportation service, Schedule T-II. The Commission accepted this filing on October 28, 1983, but suspended its effectiveness until April 1, 1984, subject to hearings and refund. Transcontinental Gas Pipe Line Corp., Order Accepting for Filing and Suspending Revised Tariff Sheets, Subject to Refund and Conditions, Granting Waiver, Initiating Hearing, and Establishing Procedures, 25 F.E.R.C. p 61,144, at 61,384 (Oct. 28, 1983).
 
 
 3
 Transco and the LDCs then entered negotiations and reached a rate settlement agreement on April 6, 1984, establishing basic cost service levels and providing that Transco would refund within thirty days of the Commission's approval of the agreement any amounts that had been collected in excess of the settlement rates. Settlement Agreement as to Rates of Transcontinental Gas Pipe Line Corp. 5 (Apr. 6, 1987) ("Settlement Agreement" or "Agreement"). The Agreement noted that Transco had made a separate filing with regard to Schedules T-I and T-II, and stated that, "only in the event the Commission does not provide for hearing of the separate filing, then Rate Schedules T-I and T-II shall be considered in the instant proceeding to have been reserved for hearing and disposition." Id. at 5. The Appendix to the Settlement Agreement contained revised Schedules T-I and T-II, but qualified these schedules as being "adjusted only for the cost of service adjustments underlying this Agreement." Id. The Commission approved this Settlement Agreement on July 25, 1984. Transcontinental Gas Pipe Line Corp., Order Approving Settlement, 28 F.E.R.C. p 61,146, at 61,265 (July 25, 1984).
 
 
 4
 The Commission held hearings on Transco's proposed increases to its Rate Schedules T-I and T-II in February and March of 1985. Following these hearings, the Administrative Law Judge ("ALJ") concluded, inter alia, that Transco had not sufficiently supported its proposed increase in its fuel retention rate from 4.8% to 6.1%. Transcontinental Gas Pipe Line Corp., Initial Decision of the Administrative Law Judge, 33 F.E.R.C. p 63,035, at 65,120, 65,155 (Nov. 8, 1985) ("Initial Decision"). The fuel retention rates are designed to "cover the cost of that portion of gas used to compress and to move the balance of the gas through the pipeline," Transcontinental Gas Pipe Line Corp., Order on Initial Decision, 46 F.E.R.C. p 61,227, at 61,682, 61,684 (Feb. 23, 1989) ("Order on Initial Decision"), stated as a percentage of the total amount of fuel transported. The ALJ cited testimony by Transco's witness that Transco's proposed 6.1% fuel retention rate assumed an essentially full pipeline, with a throughput, or utilization, rate of approximately 1,000 billion cubic feet ("Bcf."). In reality, however, the most recent figures indicated that the pipeline was operating at a throughput of approximately 975 Bcf., or less than the total maximum throughput capacity. Initial Decision, 33 F.E.R.C. at 65,154. As the fuel retention rate is directly related to the applicable throughput rate--the amount of fuel retained increases with the amount of fuel flowing through the pipeline--the ALJ found that the appropriate fuel retention rate for a 975 Bcf. throughput rate would be 4.8%. Id. at 65,155.
 
 
 5
 The Commission affirmed the ALJ's conclusions. Order on Initial Decision, 46 F.E.R.C. p 61,227, at 61,682. First, the Commission rejected Transco's arguments that the fuel retention rate had been resolved in the Settlement Agreement, and was therefore not a proper subject for hearing before the ALJ. Pointing to the fact that disagreement among the parties persisted after the Settlement Agreement regarding the appropriate fuel retention rate, the Commission concluded that neither the intervening Commission order approving the Settlement Agreement, nor the simple "passage of time" had served to resolve the issue of fuel retention costs. Id. at 61,684. In particular, the Commission found that later settlements between Transco and the LDCs in 1987 and 1988 again addressed the fuel retention rate issue, and that one of the LDCs, Philadelphia Gas Works, had specifically reserved its rights on the issue of fuel retention rates in the 1987 settlement. Id.
 
 
 6
 Second, the Commission agreed with the ALJ that the record supported a fuel retention rate of 4.8% rather than 6.1%. Accordingly, the Commission ordered Transco to refund the difference between the amount collected from its customers at the 6.1% rate and the 4.8% rate allowed by the Commission for the period between April 1, 1984 and April 1, 1987. For the period following April 1, 1987, the Commission found that the fuel retention rate was better addressed through Transco's later filing in Docket No. RP87-7-000 ("RP87-7"), which included the 6.1% figure. Id. at 61,686. Transco had submitted this filing on October 7, 1986, which the Commission accepted on November 5, 1986, to be effective April 1, 1987, subject to hearing and refund. Transcontinental Gas Pipe Line Corp., 37 F.E.R.C. p 61,089, at 61,223 (Nov. 5, 1986).
 
 
 7
 The Commission granted partial rehearing of its order on May 25, 1989. Transcontinental Gas Pipe Line Corp., Order Granting Rehearing in Part, 47 F.E.R.C. p 61,270, at 61,939 (May 25, 1989) ("Rehearing Order"). The Commission again rejected Transco's contentions that the Settlement Agreement previously had resolved the fuel retention rate, emphasizing that Article III of the Settlement explicitly reserved the T-I and T-II Rate Schedules for hearing and disposition, and that the fuel retention rate is part of the rate levels of those rate schedules. Id. at 61,944. As the Settlement Agreement did not address the T-I and T-II Rate Schedules, it also did not address the fuel retention rate, making that rate the proper subject for the ALJ's determination. Id. Having concluded that the ALJ properly reached the fuel retention rate, the Commission also reiterated that the Commission was "on firm ground" in implementing a 4.8% fuel retention rate rather than the 6.1% rate proposed by Transco. Id.
 
 
 8
 The Commission also addressed a challenge brought by the LDCs, claiming that the Commission erred in limiting Transco's obligation to provide refunds for the period of April 1, 1984 to April 1, 1987. According to the LDCs, the Commission improperly relied on Transco's filing in Docket No. RP87-7 as a rate change proposal. To the contrary, the LDCs argued, the proposal was made before Transco's previous proposal for a 6.1% fuel retention rate in Docket No. RP83-137 had been rejected, and thus did not propose a rate change but merely continued the rates of the previous proposal.
 
 
 9
 The Commission decided, however, that it was appropriate to treat the later filing as a proposal for a rate change for purposes of defining the refund period. The Commission relied simply on the difference in fuel retention rate figures: the filing in RP87-7 utilized a 6.1% figure, a different figure than the 4.8% the Commission had decided was appropriate for the preceding period covered by RP83-137. According to the Commission, Transco was aware at the time it filed RP87-7 that the Commission could reject the 6.1% figure from its earlier filing, and thus RP87-7 presented a new opportunity to propose this figure and to present arguments in its favor. Id. at 61,946. Thus, the Commission concluded, the filing in RP87-7 should end the refund period, in order that a new determination could be made and implemented for that filing.
 
 
 10
 Both Transco and the LDCs challenge the Commission's decision to uphold the ALJ's findings, as well as the Commission's decision granting partial rehearing. Transco challenges the Commission's decision to establish a 4.8% fuel retention rate in RP83-137, rather than the 6.1% fuel retention rate proposed by Transco, and the commission's ordering of Transco to refund the difference between those rates to its customers. The LDCs, on the other hand, support the Commission's decision to order refunds, but argue that the refund period should extend beyond the time period established by the Commission.
 
 II. ANALYSIS
 
 11
 A. The Commission's Interpretation of the Settlement Agreement.
 
 
 12
 Transco challenges the Commission's actions on the ground that the fuel retention rate was not properly before the ALJ and the Commission, but was instead resolved in the April, 1984 Settlement Agreement. As discussed supra, the Commission, in reaching its decisions, determined that the Settlement Agreement did not in fact resolve the fuel retention rate, but simply reserved the issue for later hearing and disposition. Thus, Transco is requesting this Court to overturn the Commission's interpretation of a settlement agreement.
 
 
 13
 This Court, however, affords a high degree of deference to the Commission's interpretation of a settlement agreement. In National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563 (D.C.Cir.), cert. denied, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987), this Court stated that, despite other circuits' varying treatment of agencies' interpretations of settlement agreements, "the correct view requires a court to give deference to an agency's reading of a settlement agreement even where the issue simply involves the proper construction of language." 811 F.2d at 1569. The Court found that this deference arises from Congress's express delegation of adjudicative authority to the agency, a delegation that "closely resembles a direct congressional authorization to implement the provisions of a statute through regulations." Id. See also Western Union Telegraph Co. v. FCC, 815 F.2d 1495, 1502 (D.C.Cir.1987) ("the law in this circuit requires a reviewing court to defer to an agency's interpretation of a settlement agreement concerning matters within its statutory field of administration").
 
 
 14
 This Court must still determine whether the agency's interpretation "reflect[s] reasoned decisionmaking that has adequate support in the record and must include an 'understandable' agency analysis and rationale." Panhandle Eastern Pipe Line Co. v. FERC, 881 F.2d 1101, 1118 (D.C.Cir.1989) (quoting Vermont Dept. of Public Service v. FERC, 817 F.2d 127, 134 (D.C.Cir.1987)). However, "if the choice lies between dark grey and light grey, the conclusion of the agency, unmistakably possessed as it is of special expertise, in favor of one or the other will have great weight." National Fuel Gas Supply, 811 F.2d at 1572.
 
 
 15
 Here, Transco relies on three factors that it believes indicate that the Commission's interpretation of the Settlement Agreement is erroneous. First, Transco argues that the Settlement Agreement was comprehensive of all the issues included in RP83-137, and therefore, because the Agreement did not explicitly reserve the fuel retention rate for later hearing, it implicitly resolved the fuel retention rate at the proposed 6.1%. Second, Transco argues that the internal logic of the Settlement Agreement requires that the fuel retention rate be established at 6.1%. As the Settlement Agreement used a throughput rate of 1005 Bcf. to derive its sales and transportation rates, Transco argues that the Agreement implied resolution of the fuel retention rate at 6.1%, the level appropriate to a 1005 Bcf. throughput rate. Moreover, it asserts, using a lower throughput rate to determine the fuel retention rate is unfair to Transco; Transco argues that the high throughput rate in the Settlement Agreement resulted in lower sales and transportation rates to the customer, while the ALJ's use of the lower throughput rate resulted in a lower fuel retention rate, also to the benefit of the customers and to the detriment of Transco. Finally, Transco argues that the conduct of the parties following the Settlement Agreement implied that they believed the fuel retention rate was resolved in the Settlement Agreement.
 
 
 16
 However, as the Commission pointed out in its opinions, none of these factors compel the conclusion that the Settlement Agreement resolved the fuel retention rate. Although Transco claims that the Settlement Agreement comprehends all of the issues in RP83-137, there is no language in the Agreement itself to so indicate that is the case. Compare, e.g., Natural Fuel Gas Supply, 811 F.2d at 1572 (finding settlement to be comprehensive where it expressly stated that it resolved "all issues now pending before the Commission in the rate proceeding"). Further, while it might appear consistent to use the same throughput rate to calculate both the sales and transportation rates in the Agreement and the fuel retention rate, it is also true that the Settlement explicitly reserved Rate Schedules T-I and T-II, each of which included a fuel retention rate, thus leaving open at least the possibility that the parties contemplated potentially disparate throughput rates being used in establishing these rate schedules. Finally, the conduct of the parties following the Settlement Agreement does not provide any clear indication of their intent. The ALJ found that later attempts by the LDCs to address the issue of fuel retention rates, both through later settlement agreements and individual comments by Philadelphia Gas Works, indicated that the parties did not believe the fuel retention rate to be resolved by the Settlement Agreement. See Order on Initial Decision, 46 F.E.R.C. p 61,227 at 61,684.
 
 
 17
 Essentially, then, the import of the Settlement Agreement toward the fuel retention rate is ambiguous. Thus, we are faced with just such a situation as the Court addressed in National Fuel Gas Supply, in which "the choice lies between dark grey and light grey." 811 F.2d at 1572. Consistent with the Court's dictate in that case, we accord "great weight" to the Commission's interpretation. The Commission has presented rational analysis in support of its decision. We therefore affirm its conclusion that the Settlement Agreement did not resolve the fuel retention rate, and that it was thus properly a subject for the Commission's determination.
 
 
 18
 B. The Commission's Refund Order.
 
 
 19
 Alternatively, Transco argues that the Commission erred in ordering Transco to refund the difference between the 4.8% fuel retention rate the Commission imposed and the 6.1% rate Transco had actually charged to its customers, for the period of April 1, 1984 to April 1, 1987. Transco argues that, even if the Settlement did reserve the fuel retention rate for later hearing and disposition, it did not also reserve the fuel retention rate for refund.
 
 
 20
 In its decision on rehearing, the Commission found that the refund issue was governed by the Commission's own order of October 28, 1983, suspending effectiveness of Transco's initial filing in this proceeding. In that order, the Commission made Transco's filing effective on April 1, 1984, "subject to refund." Transcontinental Gas Pipe Line Corp., Order Accepting for Filing and Suspending Revised Tariff Sheets, Subject to Refund and Conditions, Granting Waiver, Initiating Hearing, and Establishing Procedures, 25 F.E.R.C. p 61,144, at 61,384, 61,386 (Oct. 28, 1983) (emphasis added) ("Suspension Order").
 
 
 21
 The Commission found nothing in the Settlement Agreement to contravene the authority of the Suspension Order. The Agreement itself provided only for refunds of payments made in excess of the Settlement Rate, to be made within thirty days of the Commission's approval of the Settlement. Settlement Agreement at 4. The Agreement later provided that, "subject to the exceptions covered by Articles III and V above, Transco shall be entitled to retain all sales, transportation and storage revenues collected during the effectiveness of the rates in Docket No. RP83-137-000." Id. at 8. As Article III specifically reserved Schedules T-I and T-II, which the Commission found also to have reserved the fuel retention rate, the Commission found that the Settlement did not provide for Transco's retention of payments in excess of the 4.8% fuel retention rate. Thus, the Commission found that nothing in the Settlement Agreement preempted the effect of the Suspension Order. See Rehearing Order, 47 F.E.R.C. p 61,270, at 61,945.
 
 
 22
 As this Court previously has recognized, "[i]t is well established that an agency's interpretation of the intended effect of its own orders is controlling unless clearly erroneous." CMC Real Estate Corp. v. ICC, 807 F.2d 1025, 1034 (D.C.Cir.1986). Indeed, our traditional duty to defer can only be enhanced in the present situation by the complexity and technical nature of the ratemaking process. See Kentucky Utilities Co. v. FERC, 789 F.2d 1210, 1217 (6th Cir.1986) ("In the complex area of ratemaking, [FERC's] construction of its own opinions and orders is entitled to deference."); FERC v. Triton Oil & Gas Corp., 712 F.2d 1450, 1462 (D.C.Cir.1983) ("Certainly, we are entitled to give deference to an agency's construction of its own opinions and orders--especially in the complex area of ratemaking."). Where there is nothing in the Settlement Agreement to contradict the Commission's assertion that its own order continues to control Transco's refund obligation, we are obliged to defer to the Commission's interpretation.
 
 
 23
 C. The Refund Time Period.
 
 
 24
 Having affirmed the Commission's actions in establishing a 4.8% fuel retention rate and in ordering Transco to refund to its customers the difference between the 4.8% rate and the 6.1% rate Transco actually charged its customers, we now examine the time frame for which these refunds were to be paid. The refund period begins on April 1, 1984, the date on which Transco's initial filing in this proceeding, RP83-137, became effective subject to refund, and ends on April 1, 1987, the date on which a second Transco filing, RP87-7, became effective.
 
 
 25
 Under Section 5 of the Natural Gas Act, the Commission cannot increase the rate a natural gas company charges its customers unless that company files a new schedule implementing that change. 15 U.S.C. Sec. 717d. Thus, the prevailing contractual rates remain in effect until changed through a rate change proposal. See Phillips Petroleum Co. v. FPC, 349 F.2d 535, 539 (10th Cir.1965) ("The contract rates are binding on the parties contractually until changed under Sections 4 or 5 of the Natural Gas Act.") (citing Phillips Petroleum Co. v. FPC, 227 F.2d 470 (10th Cir.1955)). In this case, the LDCs claim that Transco's filing in RP87-7 did not constitute a filing for a rate change, but, rather, was Transco's attempt to continue the rates proposed in RP83-137. Since the Commission cannot increase a rate until the filing of a rate change proposal, the LDCs argue, the 4.8% fuel retention rate established in RP83-137, and the accompanying refund ordered by the Commission for rates charged to customers in excess of that amount, continued to remain in effect on and after April 1, 1987, and, indeed, until such time as Transco actually filed a rate change proposal in accordance with section 4 of the Natural Gas Act, 15 U.S.C. Sec. 717c. Thus, the LDCs contend that the refund period should extend beyond the April 1, 1987 limitation established by the Commission.
 
 
 26
 The LDCs' claim therefore rests on the determination of whether RP87-7 constitutes a rate change proposal. At the time that Transco submitted RP87-7, its earlier filing in RP83-137--proposing the 6.1% fuel retention rate that has been the focus of this proceeding--had not yet been subject to Commission determination. RP87-7 also included this 6.1% fuel retention rate. Since RP87-7 did not propose a fuel retention rate different from RP83-137, the LDCs argue that RP87-7 should not have initiated a new determination of the fuel retention rate, but should merely have served to continue the rate proposed in RP83-137. Accordingly, the LDCs believe that both the 4.8% fuel retention rate, and the accompanying refund to the LDCs, should extend beyond the April 1, 1987 deadline.
 
 
 27
 The Commission's opinions in this proceeding rejected this contention. The Commission found that, although it had not yet rejected RP83-137 at the time that Transco filed RP87-7, the fact remained, and was known to Transco, that the Commission could reject the proposal. Thus, by repeating the 6.1% fuel retention rate in RP87-7, Transco secured for itself the opportunity to readdress the fuel retention rate following the Commission's disposition of its proposal in RP83-137. See Rehearing Order, 47 F.E.R.C. at 61,946. In this way, RP87-7 functioned as a rate change proposal, rather than simply as a continuation of the filing in RP83-137.
 
 
 28
 Again, we are looking at Commission action deserving of a high degree of deference. The Natural Gas Act delegates to the Commission the responsibility for accepting and reviewing filings for rate changes, 15 U.S.C. Sec. 717c, a responsibility the Commission has pursued through its own regulations, 18 C.F.R. Sec. 35.13 (1990). The LDCs are thus essentially requesting this Court to overturn the Commission's implementation of its own filing requirements. In evaluating such a claim, "this court is obliged to give considerable deference to the agency's interpretation of its own regulation, according it controlling weight unless it is plainly erroneous or inconsistent with the regulation." Transcanada Pipelines Ltd. v. FERC, 878 F.2d 401, 411 (D.C.Cir.1989) (citing Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801-802, 13 L.Ed.2d 616 (1965)); accord Western Union, 815 F.2d at 1503 ("a reviewing court is required to defer ... to an agency's interpretation of its own rules"); Aliceville Hydro Associates v. FERC, 800 F.2d 1147, 1150 (D.C.Cir.1986) ("it is well settled that an agency's interpretation of its own regulations is entitled to special deference"). Moreover, "FERC is generally allowed to interpret filings according to their literal terms." Tennessee Gas Pipeline Co. v. FERC, 860 F.2d 446, 457 (D.C.Cir.1988). Here, Transco's RP87-7, on its face, proposed a fuel retention rate different from the one the Commission had implemented for the period immediately preceding the filing's date of effectiveness. While the LDCs argue that the 6.1% figure was not a rate change since it was identical to the figure in Transco's previous proposal in RP83-137, it is literally a rate change insofar as it differs from the rate actually implemented.
 
 
 29
 Finally, what the LDCs are really requesting of this Court is a decision preempting the Commission's action in RP87-7. The parties have already negotiated and reached a settlement in that filing that included a 6.1% fuel retention rate effective April 1, 1987. This settlement has been approved by an Administrative Law Judge, Transcontinental Gas Pipe Line Corp., 49 F.E.R.C. p 63,022 (1989), and by the Commission, Transcontinental Gas Pipe Line Corp., 50 F.E.R.C. p 61,399, reh'g denied, 52 F.E.R.C. p 61,308 (1990). Yet the LDCs would have us extend the refund period for RP83-137, effectively intruding upon the Commission's action in RP87-7, a ratemaking proceeding that is not even before this Court. Such a result is directly at odds with the important judicial policy of avoiding interference with agency proceedings. Cf. Papago Tribal Utility Authority v. FERC, 628 F.2d 235, 240 (D.C.Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980) (judicial review of agency action is appropriate only upon conclusion of that action); Tenneco, Inc. v. FERC, 688 F.2d 1018, 1021 (5th Cir.1982) ("This circuit will not review non-final orders of the Commission that are not definitive in their impact upon the rights of the parties and do not threaten the petitioner with irreparable harm.").
 
 
 30
 Thus, given our reluctance to interfere in an agency's proceeding, as well as the traditional deference we afford to the Commission's implementation of its own regulations, we must affirm the Commission's present choice to treat Transco's second filing in Docket No. RP87-7-000 as a rate change that effectively ended the refund period.
 
 III. CONCLUSION
 
 31
 For the foregoing reasons, we conclude that the Commission was acting reasonably and within its authority in determining the fuel retention rate in RP83-137 and in ordering Transco to refund to its customers overpayments made during the time period of April 1, 1984 and April 1, 1987. The Commission's orders in this case are therefore
 
 
 32
 Affirmed.